ELIZABETH RUHL V. KAUFFMAN & RUNGE, AND JULIUS KAUFFMAN
V. ELIZABETH RUHL.

(Case No. 1773)

1. HOMESTEAD—USE OF PROPERTY FOR CONVENIENCES OF FAMILY—EVIDENCE OF DESTI-
NATION—FORMAL DECLARATION BY HUSBAND AND WIFE OF CONTRARY INTENT, EF-
FECT OF—The actual use of a lot of ground for the conveniences of the family
has always been regarded as the most satisfactory evidence of an intention to
make it a part of the homestead; and the positive and formal declaration of
both husband and wife of a contrary intent, is not sufficient to divest property
actually used as a homestead, of the homestead protection, even when the dec-
laration is made at the very time to which the issue is confined. (Citing Jacobs
v. Hawkins, 63 Tex. 1; Medlenka v. Downing, 59 Tex. 32; Radford et al. v.
Lyon et al., Tex. Law Rev., vol. 6, p. 109.)

2. SAME—See this case for facts held to show such use of property by the husband
and wife as to constitute it a part of their homestead, and to vest it as such, upon
the death of the husband, in his surviving wife and minor children, free from
the claims of general creditors.

3. LIENS—PROPERTY PURCHASED WITH MONEY LOANED FOR THE PURPOSE—VENDOR AND
· VENDEE—K. loaned to R. $5,000, with which the latter purchased a certain lot
of ground, and with a view to the money's being so used. The title was taken
in R.'s name, and the property was intended for his own benefit. There was no
agreement that K. should have a lien. *Held*, that K. and R. did not sustain to
each other the relation of vendor and vendee, and that K. had no lien on the
property as security for his debt.

4. ESTATES OF DECEDENTS—PROBATE COURT — APPEAL — JURISDICTION OF DISTRICT
COURT—CREDITORS—That an administrator, against whom and certain creditors
of the estate being administered by him the county court has rendered judgment
in a contest therein pending between the administrator and such creditors, on
the one side, and the widow of the decedent, on the other, touching her claim
to certain property of the estate, as part of her homestead, has failed to perfect
his appeal to the district court, does not deprive the latter court of full juris-
diction of the case on appeal prosecuted by the creditors who were parties to
the proceeding in the county court.

APPEAL from Galveston.   Tried below before the Hon. Wm. H.
Stewart.

In lieu of her original application, filed March 19, 1883, Mrs.
Elizabeth Ruhl filed in the county court, April 4, 1883, her amended
application for an order setting aside to her and her three minor
children, ·as a homestead, lots eleven, twelve, thirteen and fourteen,
in block two hundred and fifty four, and improvements, in the city
of Galveston.   She averred that she was the surviving wife, and her
children the surviving children, of J. H. Ruhl, who died insolvent,
October 17, 1882, and that the property was then, and before, and
since has been, the family homestead.

· Robert Bornefeld, administrator of Ruhl's estate, filed opposition
to the application, March 26, 1883.

Kauffman & Runge, creditors of the estate, also opposed the application.

Julius Kauffman, a creditor, on his own account, joined in opposition to the order, and claimed that in so far as lot twelve was concerned, it was subject to an equitable lien in his favor, as for purchase money, for the sum of $4,000, and prayed that that lot be sold to satisfy his lien.   To this claim of lien Mrs. Ruhl filed an exception.

The court entered its decree, May 3, 1883, granting Mrs. Ruhl's application, as against all the objectors, naming them; and exceptions were taken and notice of appeal given by each of them.

The court also made its order disallowing the claim of lien made by Julius Kauffman on lot twelve, to which order Kauffman excepted and gave notice of appeal.   Kauffman & Runge and Julius Kauffman filed appeal bonds, and prosecuted their appeal; but the administrator failed to do so.

On November 19, 1883, the district court rendered judgment:

1. Sustaining Mrs. Ruhl's demurrer to Julius Kauffman's claim of lien against lot twelve, but adjudging amount of Kauffman's note to be a just claim against the estate, and directing the clerk to certify the same to the county court for observance, to be paid in due course of administration.

2. Overruling exceptions of Kauffman & Runge to Mrs. Ruhl's application, made on the ground that it was not filed in time, and that the county court was without jurisdiction to entertain it.

3. Setting aside lots twelve, thirteen and fourteen, in block two hundred and fifty-four, with improvements, to Mrs. Ruhl and children, as homestead, but refusing so to set aside lot eleven, and decreeing it to be no part of the homestead, but assets in the hands of the administrator.

4. Reversing the judgment of the county court and directing the clerk to certify the judgment of the district court to the county court for observance.

On the point ruled against him, Julius Kauffman appealed, and Mrs. Ruhl appealed from that part of the judgment refusing to set aside lot eleven, and improvements, as part of her homestead, and holding it to be assets in the hands of the administrator.

J. H. Ruhl bought of Julius Kauffman, Sr., now deceased, December 1, 1874, lots thirteen and fourteen, in block two hundred and fifty-four, for $3,000, taking deed therefor; and on the same day bought of the same party lot twelve, in the same block, for $1,400, taking a separate deed therefor.   August Roemer, on the same day, bought of Kauffman lot eleven, in the same block, for $1,400.   Ruhl

sold lot twelve, November 3, 1876, conveying by his own deed—his wife not joining—to Gabardie, for $1,450. Ruhl bought of Roemer, September 18, 1879, lot eleven, for $720. Ruhl and wife were married July 5, 1875, and, thereupon, established their homestead on lots thirteen and fourteen. Gabardie erected his residence on lot twelve, after purchasing of Ruhl, and continued, with his family, to use and occupy it as such until January 20, 1881, when he resold it to Ruhl for $4,000 cash.

Roemer, called by Mrs. Ruhl, testified, that when (September 18, 1879,) he sold lot eleven to Ruhl, there were no improvements on it, and that just afterwards Ruhl fenced it off from lot twelve (Gabardie's place) and built a stable on it.

Tobey, called by Mrs. Ruhl, testified that he commenced, in the latter part of October, and finished early in December, 1879, a stable for Ruhl on lot eleven. He was employed by Ruhl to build it. It was built for the accommodation of horses and carriages—a stable and carriage-house combined, with servants' rooms in the upper story. It was built on the north part of lot eleven, on the alley, and had three or four stalls. Witness also built to the south of the stable, on the same lot, a shed-roof, attached to temporary posts, for the protection from the weather of loose stock in the yard, and vehicles when being washed; and sank a well and put in a pump. He understood, at the time, from Ruhl, that the stable was for his, Ruhl's, own private use. The improvements named were all that were made by the witness on lot eleven.

Mrs. Ruhl, for herself, testified, that, at the time her husband died, (October 17, 1882,) he, she and their little children were living on the property, part of which is involved in this suit. There were three children—seven, five and two years of age, respectively.

Ruhl bought lot eleven of Roemer to put a stable on it. He had no place on lots thirteen and fourteen to put a stable, and as he owned a horse and buggy, he had to buy lot eleven to put a stable on it. He had the stable built on the north part of lot eleven, in the fall of 1879; and used it from that time till his death, for the keeping of the family horses and vehicles. Their cow and calf were also kept in the stable and stable-yard all that time, and since Ruhl's death there has been no change in the uses of the stable and stable-yard. Kauffman boarded with them, and kept his own two horses in the stable for the first year. After that, he kept one horse there until 1882.

Witness thought Ruhl was, for awhile, a partner of Freedman in the livery stable business. Freedman, and also Kauffman & Runge, occasionally sent horses to the stable. It was only an act of accom-

modation extended them by Ruhl. The Gabardie place, lot twelve, was bought by Ruhl in January, 1881, and very soon thereafter the cottage was moved from that lot to lot eleven, and was thenceforward used for the family. Bornefeld (the administrator) rented two of the rooms on the first floor from the time the cottage was ready for occupation. Witness' parents occupied two rooms on that floor for about two months, at first; and afterwards, these rooms were rented to Huber. From that time until Ruhl's death, Bornefeld and Huber rented and occupied their two rooms, respectively. The other rooms were occupied by members of the family. The cottage is one and a half stories high. Witness' brothers occupied rooms in the attic. Witness calls her parents and brothers members of her family.

The family had three servants, some of whom slept at the cottage, which was always more or less in use by them, especially during the summer months, when it was more comfortable than for more than one to occupy the same bed in the main house. Very often witness had no place for them to sleep in the main house, and then they slept in the garret of the cottage. The bedding and furniture not in use from time to time was stored and kept in the cottage, upstairs, and in the kitchen. A room in the cottage was occupied from August 26, 1882, until February, 1883, continuously, by a servant who was wait-. ing on witness, personally. No other uses than those indicated were made of the cottage until after Ruhl's death, when witness rented it to a private family. When Ruhl bought lot twelve (January 20, 1881,) there was a fence separating that lot from lots thirteeen and fourteen. As soon as that purchase was made, and the Gabardie cottage moved from lot twelve to lot eleven, the fence was torn down by Ruhl, and ever since that time, continuously, there has been an unbroken front to the south of the four lots—fourteen, thirteen, twelve and eleven— without any fence or partition dividing them; the four lots being embraced in one enclosure. There was, and is, a partition fence run ning from the stable, on lot eleven, south, to the north corner of the cottage, to keep the stock from going off that lot to the lots west of it. There is a gate in this fence, through which access is had to and from the stable and lot twelve. The stable opens to the south, on lot eleven, and to the north on the alley—it does not open on lot twelve. · Its west end is flush with the division line between lots eleven and twelve. It is not on a line with the west line of the cottage, nor with the brick pillars supporting the cottage. The cottage. is on a line at least three or four feet east of the line on which the fence is built.

When Ruhl bought the Gabardie place (lot twelve) the cottage was

a complete residence and occupied as such.   There was then no improvement on the lot but the cottage; neither stable, woodshed nor chicken-house.   The woodshed and chicken-house, now on lot twelve, were moved from lot eleven at the time the cottage was moved from lot twelve to lot eleven.   They were put there for the use of the family, as woodshed and chicken-house, and were so used from that time on.   Ruhl's purpose in buying lot twelve was to enlarge the homestead and provide space for a garden.   So soon as the Gabardie cottage was moved to lot eleven, lot twelve was made a garden, and a play place for the children.

The residence on lots fourteen and thirteen is a commodious, handsome and agreeable house—two stories, with eleven rooms.   The servants' rooms were in that part of the building on lot thirteen.

The improvements on the respective lots, the arrangement and enclosure thereof, and the uses of the property, underwent no change during Ruhl's lifetime, and were as stated.   Nor has there been any change since his death, save the renting of the cottage on lot eleven to a private family.

G. Ruhl, called for Mrs. Ruhl, testified that he was a brother of J. H. Ruhl, and knew all about the location and arrangement of his house.   Ruhl's object in buying lots eleven and twelve was to enlarge his homestead; he often expressed that purpose to witness before and at the time of the purchases.   His principal purpose in buying lot eleven was to erect a stable there for the accommodation of his horses, cows and vehicles.   As witness remembers, there were, at the time, belonging to the family, two horses, one or two cows, and one or two buggies.   The stable was built, and these animals and vehicles were kept there from that time until Ruhl died, for the use of the family. Ruhl's particular object as to lot twelve was to make of it a garden and playground for his children, and it was put to that purpose as soon as the Gabardie cottage was moved to lot eleven, and it was used in that way continuously to his death, and has ever since been so used.   At the time lot eleven was bought, there was a fence between eleven and twelve, and one also between twelve and thirteen. Immediately after the purchase of lot twelve, these fences were removed, and since that time the four lots, fourteen, thirteen, twelve and eleven, have been embraced in one enclosure.

The lots are each one hundred and twenty feet deep, and witness thinks cottage on eleven is twelve feet from the fence on the south front.   A fence was run between the corner of the stable on lot eleven to the corner of the cottage moved to that lot from lot twelve, to separate the stable and stable-yard from lot twelve, and to keep the

stock in their yard on lot eleven. In this fence there was a gate, giving ingress and egress between lots eleven and twelve. Witness had seen other horses besides those of the family there. Ruhl, as a special favor to Kauffman & Runge, allowed them to keep their horses and mules there about a month, pending the erection of a stable for them, on lot five, in the same block.

Julius Runge, called for Kauffman & Runge, testified, that he knew Ruhl; was an employe of their house from 1872 until his death; Ruhl erected first on lots thirteen and fourteen a cottage residence, which he enlarged to a handsome two-story residence, a year or two before buying the Gabardie place. The Gabardie lot and cottage, while occupied by Gabardie and family, constituted a comfortable home. That family lived there for years. Gabardie had no stable on the lot, or other improvements, save the cottage house. Ruhl, after buying lot eleven of Roemer, erected a stable on it. Witness didn't know whether the erection of a stable was contemplated at the time of the purchase.

Adolph Brenker, called for Kauffman & Runge, testified, that he came to Galveston December 7, 1879; was employed by Kauffman & Runge in the spring of 1880, and soon afterwards, during the same spring, went to work for Ruhl, at his place. At that time there was a stable with five or six stalls in it, and a shed on the south side of the stable, on lot eleven. After a few months, in the summer of the same year, an open stable was built on the same lot, to the south of the first stable and a little to the east of the center of the lot and near its middle, which would accommodate from sixteen to eighteen horses. It had racks for hay, and a place at the top to keep oats and hay. It was used to accommodate livery horses, from twelve to eighteen, of Freedman & Co., of which firm Ruhl was a partner. Before the open stable was built, the first stable built — that on the north end of the lot—was used to shelter livery horses, to the extent of its stalls, and as a paint-shop up stairs. An elevator ran to the upper floor, and the up-stairs was used for painting buggies and carriages.

Witness remained in Ruhl's employ until the fall of 1880—then hired to Kauffman and attended to his horse there in the same stable until the summer of 1881, after which Kauffman's horse was moved and witness had nothing more to do with the place. "So far as I know, Mr. Ruhl had no horse on the place until I went there, and I brought his first horse there from the country and broke it in. He kept a horse there in the stable, his own horse, for his private use, and his own buggy, the whole time of my stay at the place. He kept also a cow and a calf for family use the whole time. These were kept

under the shed next to the stable, on lot eleven.   The horses of Freedman & Co., were taken away from the place in the fall of 1880.   Mrs. Ruhl did not have a special horse and buggy while I staid there."   Witness was never on lot twelve after Gabardie left there.   Gabardie did not keep a horse or buggy.   No horses were kept on the premises, except on lot eleven.

Robert Bornefeld, administrator of Ruhl's estate, called for Kauffman & Runge, testified, that he knew Ruhl well—they were friends—intimate—in the service of the same firm.   Ruhl bought lot eleven about the time he went into partnership with Freedman in horse trading.   They intended to do a large business.   Witness frequently heard the talk between them.   The lot (eleven) was bought especially because they wanted to go into the horse-trading business, and the stable was put up for that purpose.   The lot was bought principally for the purpose of keeping horses there, brought from New Orleans and the west, and the stable was used for that purpose until the business proved unprofitable, and Ruhl dissolved the partnership, in the fall of 1880.   The horses were sold, and nothing was kept there from that time but Ruhl's one horse.   Ruhl had only one horse himself until the summer of 1881, when he bought a horse for Mrs. Ruhl, and another buggy.   Before and after Freedman's horses left his place (in the fall of 1880) Ruhl kept his own private horses and buggy in the stable on lot eleven.   He bought a horse for himself just about the time he bought lot eleven, or while the stable was being erected, and later on bought a horse and buggy for his wife, and these were kept in his stable on that lot, from that time, until his death.

After the Freedman & Co. business ceased, Ruhl proposed to Gabardie to exchange lot eleven for thirty-three feet on the west side of lot twelve, so that Gabardie could move his cottage on the fifty-three feet made up of the remainder of lot twelve and lot thirteen, and Ruhl could add thirty-three feet to the east of lot thirteen.   Gabardie refused, and offered to sell the whole of lot twelve, with the cottage.   Ruhl then told Kauffman he could buy the place for $4,000, and he would buy it and fit it up if Kauffman would lend him $5,000.   Kauffman made the loan, and the purchase was consummated.

When the purchase was made, Ruhl told witness he would move the cottage to lot eleven and rent rooms in it to witness and some one else, and if Mrs. Ruhl's parents wanted to stay in Galveston, they could occupy rooms there.   From the time the cottage was moved to lot eleven, and fitted for occupation, about July, 1881, to seven or eight months after Ruhl's death, witness rented and occupied two rooms on the first floor, and Huber rented and occupied two rooms

on that floor, save that Huber's rooms were, for the first two months, occupied by Mrs. Ruhl's parents.

These four rooms were the front part of the cottage  The back part of it was unoccupied, and the upper part was used for storing Mrs. Ruhl's furniture and bedding.   One garret room was occupied by brothers of Mrs. Ruhl the whole time.   "There were no servants there; but they might, or might not, have been there for a part of two summers when I was absent.   I won't be positive that.they did not come there occasionally and sleep.   I did not know of it if they did."

Ruhl and witness talked a great deal about these matters.   Witness knew from what Ruhl said to him that it was his purpose in buying lot twelve to make it a part of his homestead.   He had before that largely improved his residence, and wanted more ground for his children.   There was no dispute that the estate of Ruhl was insolvent; nor was it controverted by the evidence that the four lots claimed by Mrs. Ruhl were of an aggregate value within the constitutional limitation.

Kauffman & Runge are not lien creditors of the estate; nor did any item of the indebtedness of Ruhl to them accrue prior to 1882.

On the trial of the issue between Mrs. Ruhl and Kauffman & Runge, as to whether lot eleven, and improvements, were, at the time of Ruhl's death, a part of the homestead of himself and family, and should be set aside as such, Kauffman & Runge offered in evidence a trust deed made by Ruhl and wife to the Citizens' Loan Co.   Mrs. Ruhl objected to the introduction of the deed as irrelevant and inadmissible:   1, because it was a transaction between other parties; 2, because the evidence, before the court, tended to show, not only designation of the lot as part of the homestead long prior to the execution of the trust deed, and its uses as such, but also the designation, occupation and use of it after the execution of the trust deed continuously to, and since, the death of Ruhl; and, as against such designation, uses and occupation after the trust deed was executed, that instrument was irrelevant and inadmissible as evidence of the limits of the homestead.

The objection was overruled and the deed admitted.   The instrument recites, "we do here designate lots thirteen and fourteen, in block two hundred and fifty-four, and the improvements thereon situated, as our homestead."   It is dated July 7, 1880 ; was signed and acknowledged by J. H. Ruhl and applicant, his wife, and filed for record on the twelfth of the same month.

The statement, by Julius Kauffman, of the nature of the lien

claimed by him on lot twelve, block two hundred and fifty-four, and to which a general demurrer by Mrs. Ruhl was sustained, in both the county and the district court, was as follows :

"That early in the month of January, 1881, at the special instance and request of J. H. Ruhl, he agreed to advance and loan to him, J. H. Ruhl, the sum of $5,000, for the express purpose of enabling him to purchase lot number twelve, block two hundred and fifty-four, city of Galveston, and to remove therefrom and repair the tenement and appurtenances; that, thereupon, Ruhl did negotiate the purchase at $4,000 cash, and your petitioner did, thereupon, advance and loan Ruhl the sum of $4,000 wherewith to make the purchase; that the purchase was so made and the money so used by Ruhl, and, thereupon, Ruhl executed and delivered to petitioner his note for the $4,000; and the further sum of $1,000, used in removal and repairs as aforesaid— the note being the same for $5,000 heretofore filed by him as a claim against the estate. The lot was so purchased by Ruhl for his own use and benefit, and in his own name, but the purchase money therefor was paid, exclusively, by petitioner, and no part of the same has ever been repaid. Wherefore, he says he is entitled to an equitable lien as for the sum of $4,000 on lot twelve, and he prays that the same be established and declared, and that the premises be sold therefor; and he prays for all such other and further orders and decrees herein as may be meet and proper, and to law and equity appertain."

Mrs. Ruhl, on her appeal, assigned the following as errors :

1. "The court erred in rendering judgment in favor of the appellants, Kauffman & Runge, and the judgment in their favor was not, in law, competent to be rendered upon the case presented to the court, upon the appeal from the county court; and the proper parties were not before the court to justify, or authorize the rendition of the judgment. Because the transcript of the cause from the county court showed a final judgment in that court against the administrator of the estate in favor of Elizabeth Ruhl, upon the issue made by her application for setting aside of lots eleven, twelve, thirteen and fourteen, in block 254, and improvements, as a homestead, and the opposition of the administrator thereto, and the judgment in the county court is conclusive upon that issue against the appellants, Julius Kauffman and Kauffman & Runge, the administrator is not a party to the proceedings or judgment in the district court, and the judgment against him in the county court is still in force, unappealed from and unreversed; and it does not appear that the acquiescence of the administrator in the judgment is due to any fraud, or neglect of duty, on

his part, as to the lawful and official representative of the creditors of the estate."

2. "The court erred in overruling the objection of Elizabeth Ruhl to the introduction in evidence of the trust deed made by Ruhl and wife to the Citizens' Loan Co."

3. "The judgment of the court is contrary to law, and unwarranted by the evidence—in that, upon the facts as proven, lot eleven and improvements, at the time of Ruhl's death, were lawfully a part of the homestead of himself and family, and should be set aside as such to his widow and children."

Julius Kauffman, on his appeal, assigned the following as error:

"The court erred in sustaining exception to so much of appellant's claim as set up a lien, preference, or privilege, on lot twelve, block two hundred and fifty-four, city of Galveston, and in setting aside the same as homestead, and in rendering judgment for costs against him on his application."

*Hume & Shepard*, for Elizabeth Ruhl, that the district court was without jurisdiction to render the judgment that was rendered by it in the cause, in the absence of the administrator as a party to the proceedings on appeal, cited: R. S., arts. 1815, 2207, 2208; Shackelford v. Gates, 35 Tex. 782, 783; Evans v. Oakley, 2 Tex. 182; Moore v. Morse, 2 Tex. 400; Rogers v. Kennard, 54 Tex. 36, 37; Lacy v. Williams, 8 Tex. 182; Freeman on Judg., sec. 163; Pickens v. Yarborough, 30 Ala 408-411; Castellaw v. Guilmartin, 54 Ga. 299-302.

That use, either convenient or necessary, is the homestead test, they cited: Const., sec. 51, art. 16,; Arto v. Maydole, 54 Tex. 247; Peregoy v. Kottwitz, 54 Tex. 498, 499, 501; Andrews v. Hagadon, 54 Tex. 576; Pryor v. Stone, 19 Tex. 372, 373; Hancock v. Morgan, 17 Tex. 585; Evans v. Womack, 48 Tex. 232; H. & G. N. R'y Co. v. Winter, 44 Tex. 611, 612; Brooks v. Chatham, 57 Tex. 33, 34; Scott v. Dyer, 60 Tex. 135.

That a homestead of less value than the constitutional limit may be increased to that limit by the addition of other lots, they cited: Brooks v. Chatham, 57 Tex. 33, 34; Campbell v. McManus, 32 Tex. 450-452; McManus v. Campbell, 37 Tex. 267.

That the husband's declarations of purpose, with respect to a particular lot, cannot, in the face of a homestead use made of it, affect the wife's homestead right therein, they cited: Thomas v. Williams, 50 Tex. 275; Eckhardt v. Schlecht, 29 Tex. 132-134; John v. Battle, 58 Tex. 600, 601.

That lot eleven being Ruhl's property, and, in fact, used for home-

stead purposes, an additional use of a part of it not inconsistent with homestead use, or the renting of a part of the cottage therein, would not divest the homestead right, they cited: Const., art. 16, sec. 51; Hancock v. Morgan, 17 Tex. 586; Pryor v. Stone, 19 Tex. 372; Smith v. Chenault, 48 Tex. 461.

That the transaction between Julius Kauffman and Ruhl was a mere lending of money, and no equitable lien accrued therefrom to the former, they cited: Morris v. Giesecke, 60 Tex. 633; Boehl v. Wadgymar, 54 Tex. 589; 2 Washburn on Real Prop. p. 91, sub-division 17; 1 Jones on Mortg., sec 212, top page 213; Stancel v. Roberts, 13 Ohio, 149; Notte's App., 45 Penn. St. 363; Parker and wife v. Cook, Tex. Law Rep. of Sept. 1883, 284; Perry on Trusts, sec 133, and cases there cited; Six v. Shaner, 26 Md. 415; Waterman v. Seely, 28 Mich. 77.

*Robert G. Street*, for Kauffman & Runge and Julius Kauffman, that Kauffman & Runge, as creditors, had the right to file opposition in writing to Mrs. Ruhl's application to set aside homestead and the right of appeal from the decision of the county court to the district court, cited: R. S., arts 1818, 2200, 2202.

That Julius Kauffman having advanced Ruhl the money with which to purchase lot twelve, and the money having been so used, he had an equitable lien on the property, the equitable principle being that the property shall not be exempted from the payment of debts until the particular debt incurred in its acquisition, and by means of which it was acquired, has been paid, he cited: Const., Gen. Prov., sec 50; Perichain v. Collard, 13 Tex. 333; Thompson on Homesteads, sec. 338; Nichols v. Overacker, 16 Kan. 54.

ROBERTSON, ASSOCIATE JUSTICE.—What Ruhl's purpose in purchasing lot eleven was, and what use he intended to make of it and did apply it to, in the years 1879 and 1880, are inquiries bearing upon the issue in controversy; they are not themselves the issue, nor necessarily decisive of it. Mrs. Ruhl was entitled to have set apart to her, in this proceeding, the homestead of the family as it existed within constitutional limits at the date of her husband's death, in 1882. What constituted the homestead at that date is the matter to be determined. Let it be conceded that lot eleven was bought in 1879 on speculation, or for business purposes distinct from any home use, and that it formed no part of the homestead in the years 1879 and 1880; yet, if it was afterward appropriated as part of the homestead and was so used and intended at the date of Ruhl's death, the judgment below cannot be sustained.

The constitution does not limit the number of lots which may be embraced in the urban homestead, and it is not claimed that the four lots at any time transgressed the prescribed value. The issue is narrowed to one of use and intention.

Lots thirteen and fourteen were the original homestead. Lot eleven was purchased in 1879—it was separated from lots thirteen and fourteen by lot twelve, which was purchased by Ruhl in January, 1881. The four lots, all owned by Ruhl, became thus, if we discard the imaginary lines dividing the several lots, a single tract of land bounded on two sides by streets, on a third side by an alley running through the middle of block two hundred and fifty-four, and on the fourth side by the outside line of lot eleven. The situation was thus decidedly favorable for extending to the outside boundaries the homestead limits. Whilst the constitution authorizes lots not contiguous to be united in one homestead, it would naturally require more distinct evidences of such destination in proportion to the inconvenience of using as parts of the same home lots remote from each other. There was nothing in the situation of these four lots to prevent their convenient use as parts of one home; and an occupant of lots thirteen and fourteen, desiring to enlarge his seat, could do so only in the direction of lots eleven and twelve, without crossing a street or an alley. The purchase of lot twelve by the owner of lots eleven, thirteen and fourteen, solidifying the tract, was in line with and suggestive of an intention to use the whole as one homestead.

The cottage on lot twelve, when it was purchased, was moved upon lot eleven. A garden was then located upon lot twelve. The fences within the boundaries of the entire tract were so arranged as to leave in the same yard the cottage on lot eleven and the main dwelling on lots thirteen and fourteen, and direct connection within the premises was established between the dwelling and the enclosure about the stable, on the rear end of lot eleven. In the stable and its enclosure were kept the family milch cow and calf, and the horses and vehicles used by the family. Lot eleven was thus appropriated to a strictly home use, with every indication of permanency in the arrangement, with nothing occurring after the purchase of lot twelve, suggestive of any other design than that indicated by the use.

The actual use of a lot for the convenience of the family has always been regarded as the most satisfactory evidence of an intention to make it part of the homestead. In reported cases involving controversies over the intent, this best evidence of it did not generally exist, and the determination of the issue has been forced to other means. But even the positive and formal declaration of both husband and

wife of a contrary intent, as has been held, are not sufficient to divest property, actually used as a homestead, of the homestead protection (Jacobs v. Hawkins, 63 Tex. 1), even when the declaration is made at the very time to which the issue is confined.    Medlenka v. Downing, 59 Tex. 40.    See also Wood v. Lyon, decided at this term.    The use of a portion of lot eleven for a stable and cow-lot, from about January, 1880, until Ruhl's death, is not controverted ; that this is a home use, making at least that portion of the lot exempt, cannot be denied, and the intent to incorporate the lot as part of the home is, in the interval stated, not contradicted by a single fact in the evidence, unless moving the cottage upon the front part of the lot is such fact.

This cottage seems to be unusually large and costly for an outhouse. In the photographs sent up with the record, it has the appearance of a very respectable and comfortable dwelling.    The erection of such an improvement upon what, may otherwise have been part of the homestead, would be strong proof of an intention permanently to appropriate the ground covered to independent uses.    The addition to the main dwelling of the same structure, would be simply an enlargement of the mansion.    The different motives ascribed to the different improvements arises from a consideration of what is usual and customary.    It is not usual for one, who desires more house room, to erect an independent structure, and, hence, to such an act is ascribed some other motive.    But what the motive is, is a matter of evidence, in every case.    So, if Ruhl had erected this cottage on lot eleven, it would only have been *evidence*, itself open to explanation, contradictory of the other proof of an intention to make lot eleven a part of his homestead.    But he made no such erection.    The cottage was on lot twelve when that lot was purchased, and he was not required, in order to enable him to accomplish his design to make all four of the lots his homestead, to destroy the cottage, or sell it at a sacrifice, or remove it entirely from the premises.    He had the right to remove it to any part of his homestead, where he could make it the most serviceable to his family.    It was accordingly moved upon lot eleven, and there, during the life of Ruhl, it was applied to uses entirely consistent with the design to make lot eleven part of the enlarged homestead.    This cottage, after its removal, occupied in part, part of the time, by Mrs. Ruhl's parents, in part by her brothers, in part by family servants, and in part by renters of particular rooms, is the single and, to our minds, clearly insufficient circumstance militating against the intent, otherwise abundantly manifested, of Ruhl to make of these lots one, and of that one his homestead.    As presented here, the

judgment of the court below, refusing to set aside lot eleven, as part of the homestead, is practically unsupported by the evidence.

The demurrer to the claim, by Julius Kauffman, of a lien upon lot twelve was properly sustained.    It was alleged that he had loaned to Ruhl the money with which lot twelve was purchased, with a view to its being so used.    The title was taken in Ruhl's name, and the property intended for his benefit.    There was no agreement for a lien, as in the case of Nichols v. Overacker (16 Kan. 54) and in all the cases cited in the note to sec. 338 of Thompson on Homesteads, &c., and Kauffman and Ruhl did not sustain to each other the relation of vendor and vendee.    Malone v. Kauffman, 38 Tex. 455.    See also Boehl v. Wadgymar, 54 Tex. 589.

The failure of the administrator to perfect his appeal to the district court did not deprive that court of full jurisdiction of the case on the appeal taken by Kauffman & Runge and Julius Kauffman, who were parties to the proceeding in the county court and authorized by statute to have its action revised by their appeal.    R. S., art. 2200.

The only error in the judgment below is that with respect to lot eleven.    For this, the judgment is reversed, and such judgment will be here rendered as ought have been entered in the court below: That lots eleven, twelve, thirteen and fourteen be set apart to Mrs. Ruhl, as exempt from administration; that Julius Kauffman take nothing by his claim of lien on lot twelve; and that Kauffman & Runge and Julius Kauffman pay all the costs of this court and the court below.    It is so ordered.

REVERSED AND RENDERED.

[Opinion delivered March 23, 1886.]