**BENAVIDES et al. v. HOUSTON ICE & BREWING ASS'N et al. (No. 7907.)**

(Court of Civil Appeals of Texas. Galveston. May 21, 1920. Rehearing Denied June 24, 1920.)

1. **Appeal and error** ⟨⟩1047(5)—**Refusal to require production of books immaterial in view of evidence.**

Where all obligations sued on were in writing, and one of the parties admitted them unpaid, the court's refusal to require intervener to produce its books to show the state of accounts is immaterial.

2. **Homestead** ⟨⟩170 — **No acquirement of homestead right where waived in contract.**

Where a husband and wife borrowed money from intervener to purchase lot and erect building, agreeing to give a lien thereon before moving therein, they acquired no homestead rights in the property prior to the execution of such lien; and, where in the lien they agreed that no homestead claim of either could defeat the lien, neither could do so, so long as the indebtedness was enforceable against either of them.

3. **Limitation of actions** ⟨⟩143(4)—**Husband's extension agreement of purchase-money debt does not affect wife's homestead right.**

Where a husband and wife borrowed money from intervener to buy lots and construct buildings thereon, and gave notes therefor prior to moving onto the property, and subsequently the husband alone by agreement extended the time of payment, he could not renew the wife's indebtedness, which had become barred by the four-year statute (Rev. St. art. 5688), so as to defeat her homestead rights.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Three separate suits between Perfine Benavides and her husband and others were consolidated below, and from the judgment favorable to the Houston Ice & Brewing Association Perfine Benavides and husband jointly appeal. Judgment reformed and affirmed.

Maco & Minor Stewart, Albert J. De Lange, Jules Damcam, W. N. Zinn, and P. A. Drouilhet, all of Galveston, for appellants.

James B. & Charles J. Stubbs, of Galveston, for appellees.

GRAVES, J. The judgment here appealed from was entered in a cause having its basis in the consolidation below of three separate suits in that same court between or among the parties to this litigation. First there

---

was No. 34509, a suit for divorce and settlement of property rights brought by Perfine Benavides against her husband, Joe Benavides, in which by the court's permission the Houston Ice & Brewing Association intervened on October 12, 1918, declaring that it held twenty-three unpaid, valid, and enforceable notes out of a series of 33 notes executed by Joe Benavides August 23, 1912, and payable to its predecessor in title thereto, upon which there was then a balance due of $6,839.62, that same had been given as part of the purchase price for and were secured by a deed of trust on lots 2, 3, the west half of 4, in block 395, and lot 14, in block 462, all in the city of Galveston, together with all improvements on any of them located, further setting up an additional indebtedness of $853.28 on open account against both Joe and Perfine Benavides, also claimed to be secured by the deed of trust mentioned, and praying for judgment for its aggregate debt of $7,692.90, together with foreclosure of the lien declared upon, against both the husband and wife. Decree in that proceeding followed on October 16, 1918, whereby Benavides and wife were divorced, property rights disposed of as between them, and intervener brewing association was given judgment against them both for the full amount it sued for, with like establishment and foreclosure of its lien upon the 2½ lots in block 395 only, lot 14, in block 462, not being referred to, it being further provided that no execution for the debt should issue over against Perfine Benavides, and that there should be a stay for 90 days of any execution, as well as of partition of community property between the divorced parties.

Next in sequence came cause No. 34825, filed January 21, 1919, by Perfine Benavides alone, as plaintiff, against Joe Benavides and the brewing association, as defendants, in which she ought to have the above-described decree in preceding suit No. 34509 set aside as not binding upon her, on the claim that she did not understand the English language; had only had attorneys to represent her in the divorce feature of that proceeding; did not know anything of or understand anything about the matters involved in the brewing association's intervention therein, and that the 2½ lots in block 395 so foreclosed upon constituted at all times since its original purchase on July 23, 1912, and still did, the homestead of herself and family, that the debt so fastened upon it was neither valid nor a lien as against her rights in the property—a large part of it being barred by limitation—and that the decree lacked finality because no disposition was made of lot 14, block 462, which she prayed be first sold in satisfaction of the claimed indebtedness, if any was, before recourse be had to the homestead property; demurrers presented

by the brewing association to these allegations were overruled by the court on March 3, 1918.

Thereafter, on April 15, 1919, the brewing association as plaintiff filed against Perfine Benavides, as defendant, the last of the three suits, that is No. 35025, in which it sought to enjoin her from further prosecuting her suit No. 34825 until the issue of whether or not she had understood the intervention proceedings in the first suit could be determined, charging that her allegations in No. 34825 that she did not understand were untrue and fraudulently made, and further averring that the judgment on its intervention in No. 34509 was in all respects a valid and still subsisting one. Following the presentment of an answering plea in abatement on the part of Perfine Benavides, wherein she averred that all issues last attempted to be raised by the brewing association were already pending between the same parties in cause No. 34825, and in the alternative prayed for a consolidation, the court formally merged Nos. 34825 and 35025, and, after amended pleadings in behalf of each of the three litigants had been filed, later proceeded to try and decide all three suits as one, reciting in its final judgment that such consolidation had been by agreement of all parties.

These amendments in the consolidated cause included an amplified reiteration by Perfine Benavides of the allegations of her original petition in No. 34825, above summarized, a joinder by Joe Benavides in such renewed claims on her part of homestead rights in the 2½ lots in block 395, invalidity of and two and four years' limitation against the debt sued on by the brewing association, and failure of the original decree to dispose of lot 14, block 462, together with further plea in his behalf that he too had been without notice or knowledge of the filing of the intervention so formerly heard and determined; also, on the brewing association's part, a reassertion against both Joe and Perfine Benavides of the debts and lien it had first declared upon in its intervention, now setting up, however, in lieu of its former claim of $853.28 as due upon open account, that Joe Benavides had executed a note on which the balance unpaid amounted to that sum.

On final trial after such merger and making of issues, the court, at different stages during its progress by separate charges to that end, peremptorily directed the jury to find: First, that the judgment in original cause No. 34509 was void; second, that Intervener Brewing Association was entitled to recover $7,823.37 against Joe Benavides, with 6 per cent. per annum interest from that date; that for $6,807.02 thereof it had a lien on the 2½ lots in block 395 against both Mr. and Mrs. Benavides, as of date August 23,

1912; and that Mrs. Benavides had not shown herself entitled to a divorce. Verdicts having been accordingly so returned, judgment pursuant thereto in all particulars followed; the court further ordering a foreclosure of this lien upon and a sale of the 2½ lots involved, with special provision, however, that no money recovery be had and no execution issue against Perfine Benavides, concluding with the usual recitation that execution might issue in favor of the court's officers against each party to the suit for the costs by each respectively incurred.

Joe and Perfine Benavides, as husband and wife, jointly appeal, making common cause in this court by attacking the brewing association's recovery below; no complaint being presented here against the trial court's refusal to divorce them. In differing forms through a number of assignments their chief contention is that their several pleas of homestead rights in the 2½ lots foreclosed on and of limitation against the indebtedness recovered for should have prevailed, in whole or in part, and in behalf, respectively, of either the one or the other of them, according as from their different positions they separately presented such defenses.

The facts developed upon these issues may fairly, it is thought, be thus briefed:

On July 23, 1912, Benavides, who with his wife and children was then living in a house on Mechanic street, owned by him, but located on rented ground, bought by deed to himself, duly recorded the same date, from Robert Webber, for $2,250, the 2½ lots here involved, for the purpose of putting a building thereon to be used at the same time as a residence, grocery store, and saloon. The $2,250 used by Benavides in buying this property was borrowed by him from the brewing association, but no vendor's lien in its favor for the amount was retained in the deed from Webber to him, nor were any notes or deed of trust against the lots on that day executed by him to it. There had been, however, a prior arrangement or agreement between him and the association's agent, under which it was to lend him the money both for the purchase of the lots and the construction of the building for the purposes stated, such intended use of the property being known to this agent at that time. Immediately after this purchase of the lots the erection of the building thereon was commenced; the lower floor being fixed up for a grocery store and saloon, and the upper one for a residence. The brewing association also, in payments made direct by it to his contractor, loaned Benavides the money for these improvements, and while, as was likewise the case in the taking of title to the lots, there was at that time no written contract for a lien on the propery to secure these expenditures, we think the reasonable construction of the tes-

timony touching that matter of both immediate parties to the transaction, that is, of Benavides himself and of Mr. Rossi as agent of the brewery, to be that it was mutually understood and agreed between them, when the arrangement was first made whereby the brewing association was to advance the money for buying the ground and erecting the two-story building thereon, that it was to have a lien on both as security for the money. Mr. Rossi said:

"Those notes represent money that the Houston Ice & Brewing Company advanced to Mr. J. Benavides for the purpose of buying the ground and the erecting of the two-story building on said ground, which was to be occupied by Mr. Benavides for business purpose and also for his family.

"Q. Now, was any security agreed to be given for those advances? A. There was an understanding and agreement with Mr. Benavides that the Houston Ice & Brewing Company was to advance the money for the purposes that I just stated. I think he was to give us a lien on the property to secure the company for the money that we advanced to him."

On the same point Benavides' testimony was this:

"Mr. Rossi paid the money for those lots, 2, 3, and west half of 4, in block 395. Mr. Rossi paid for all the improvements and lots, too—paid everything. He paid for that *lot 14, in another block*, that is mentioned here. I expect some of *that* was my money. That lot 14, in block 362 was sold some time ago, and Mr. Rossi got the money, $1,600, the company got all of the money. When Mr. Rossi paid *that* money for me, I did not promise to give him a lien on the place, a deed of trust. Nearly all that money was mine, you know. I had that money from that old place that I sold over there. From the other party that I sold to I had nearly all that money; belonged to me. That is why he didn't ask me no lien on the property, I suppose. I give him a lien on *this one in here* because he put up all the money. I signed that for a lien on it, and that deed of trust was signed before the building was completed, and before I moved on the property."

The italics are our own, emphasizing what we conclude Mr. Benavides meant to say, that is, that nearly all the money paid for lot 14, in block 462, was his own, and as a consequence he had not agreed to give Mr. Rossi a lien on that place, but had given him one "on this one here," that is, the 2½ lots in block 395, because he had put up all the money expended on them.

Exactly a month subsequent to his above-described purchase of these 2½ lots, however, on August 23, 1912, Benavides, joined by his wife, did execute and deliver to the brewing company, whose rights therein afterwards passed to the intervener here, a deed of trust on these lots in block 395, as well as upon lot 14, in block 462, to secure the payment of the 33 notes of the same date he

alone had given, the unpaid 23 of which have been already referred to herein as having been sued upon by the intervener in this action; there being a further recitation in this instrument that it should also cover and apply to any future indebtedness its grantors might incur to the brewing company, and the following renunciation of any homestead claim to the property covered:

"And the said parties of the first part hereby declare * * * that the property hereinbefore mentioned and conveyed to said party of the second part forms no part of any property by them owned, used or claimed as exempted from forced sale under the laws of the state of Texas, and disclaim and renounce all and every claim thereto under any such law or laws."

The 33 notes were made payable one each month after their date until all should mature; that is, the first one becoming due September 23, 1912, and another each successive month thereafter, interest at 6 per cent. per annum from date and the usual 10 per cent. attorney's fees also being provided for. The first 10 of the 33 notes had been paid and surrendered to Benavides, who had also been credited with a payment of $122 on note No. 11, so that the intervention and recovery thereon here, as above stated, were limited to the balance claimed and found to be due and unpaid on notes 11 to 33 inclusive.

At the time these notes and the deed of trust to secure them were executed Benavides and family were still living in the house he owned on Mechanic street, this two-story building on the lots in block 395 not having then been completed, although some of their household goods had been put into it on the same morning, or the day before; the trust deed was signed in the afternoon. The family moved in about a week later; and, while Benavides himself lived elsewhere part of the time, his wife and children continued to make this building their home from that date on until this trial below. During that period other improvements were added, until at the time of the trial there were nine dwelling houses, at least some of which were occupied by renters, one garage, and one stable on the 2½ lots in controversy.

On February 15, 1918, when, of the series above described, notes Nos. 11 to 15, inclusive, were more than four years past due, Joe Benavides alone, his wife not joining therein, executed a written renewal or extension agreement, by the terms of which the unpaid notes, that is 11 to 33, inclusive, were made to fall due, the first one on the 15th of April, 1918, and, of those remaining, one every two months successively thereafter until all had again become due.

At the outset of a determination of the questions urged by appellants, we conclude that all their assignments having as an objective the raising of any issues either as to the correctness of the aggregate amount of the indebtedness recovered upon, or touching that portion of it loaned by the brewing association to Joe Benavides, should be overruled without detailed discussion, under findings of fact here now made that all the obligations as finally sued on by the intervener were in writing, were offered in evidence on this trial, and that in his own testimony Benavides admitted them to be still unpaid, as well as that intervener had furnished him the entire purchase price of both lots and the improvements so placed thereon.

[1] This condition of the record also renders immaterial any error, if such there was, in the court's refusal to require the brewing association to produce its books in order that the state of accounts as there reflected, between it and Benavides might be gone into.

[2] The correctness of the judgment rendered, then, depends upon whether or not the intervener's debt and lien were good as against the homestead and limitation claims so interposed in defense. We think they were, except as to the wife, Perfine Benavides, for such portion of the lien so foreclosed as rested upon that part of the indebtedness shown to be barred by the four-year statute of limitation at the time the extension agreement was made by the husband alone on February 15, 1918, mainly upon these considerations: Under the facts given no homestead right in behalf of either husband or wife, as against the intervener's claim to a lien for the entire purchase money it had furnished, in fact or law was acquired in the property prior to the execution of the notes and deed of trust thereon. Having agreed at the time all the money for the actual cost of the premises was advanced for him to give the lien to assure its repayment, and then formally by written instrument, in conjunction with his wife, so acknowledged before he moved in and while yet living with his family in a house he owned elsewhere, no homestead claim of Benavides himself nor of his wife could defeat such lien, so long as the indebtedness it secured remained enforceable against either of them. Such, we think, has been the uniform holding of our courts when applied to facts of the same import and effect as here obtain. Kempner et al. v. Comer et al., 73 Tex. last paragraph page 202, 203, 11 S. W. 194, and cited cases; Johnson et ux. v. Arrendale, 71 S. W. at page 47, par. 3, and authorities therein cited; Crow v. Kellman, 70 S. W. 565; Parker v. Bushong, 143 S. W. 282; Clitus v. Langford, 24 S. W. 326; McCarty v. Breckenridge, 1 Tex. Civ. App. 170, 20 S. W. 997, writ of error refused; Hicks v. Morris, 57 Tex. 658; Ruhl v. Kauffman, 65 Tex. 723; Roy v. Clarke, 75 Tex. 32, 12 S. W. 845; Mustain v. Stokes et al., 90 Tex. 363, 364, 38 S. W. 758; Jenkins et ux. v. Guaranty State Bank of Palestine, 189 S. W. 304.

The principle upon which these decisions rest is thus tersely stated by our Supreme Court in the Roy v. Clarke Case, supra:

"The reason of the rule that homestead rights cannot be asserted in a case like the present is that no such rights are acquired as against the person to whom the purchase money is due for the homestead. This rule we understand has been long recognized in this state. Farmer v. Simpson, 6 Tex. 303; Stone v. Darnell, 20 Tex. 14; Flanagan v. Cushman, 48 Tex. 247. See, also, Thompson on Home Ex. Sec. 331 et seq. * * * Until the purchase money is paid the purchaser has not such an estate as will support the homestead right against the person to whom such purchase money is due."

It is not thought anything of value might be added by further discussion here of a doctrine so early laid down and so often reaffirmed since, and that is forborne, but it may be remarked that, while our fact findings here include one that at the time the money was advanced there was an agreement between the parties for a lien, under the other stated facts appearing we do not think the existence of a lien in this instance hinged upon that as an indispensable condition precedent, because under the undisputed evidence, indeed from the admission of both Benavides and his wife, the deed of trust itself, containing their solemn renunciation of any homestead claims in the property as of that date, was executed, acknowledged, and delivered by them a week before they left the home they were then living in, or even attempted to occupy for such purpose the one they so mortgaged for the purchase money. Whatever may have been their mere intention as to making it their home before that time, and although they may just preceding the signing of this document have put some household furniture into it, these deliberate acts upon their part—done in order to secure prior advances of the entire cost of the property, and probably required before its possession for occupancy was turned over to them—amounted to an effectual renunciation of it, just as the Supreme Court held occurred in the Kempner v. Comer Case, supra, wherein this was said:

"But the parties claiming homestead expressly abandoned and renounced their intention to use and occupy the premises as a homestead before it was so used, and this renunciation was made, not by mere declarations, but in the solemn form of a deed, the wives joining; and all this was done in order to include the property in the deed of trust then being made to secure advances and borrowed money. In such case the law will give effect to the renunciation. There was in fact no homestead in the premises when renounced. It was the intention of the parties to make it so, and they had made preparations to occupy it, thus evidencing by acts their intention; but until that intention was consummated by use as a homestead it could be renounced even by declaration of the parties."

[3] On the question of limitation, we think that privilege was never available to Benavides himself, because he owed the money, gave the notes and the lien on the property for the whole of it, and then renewed, reinstated, and so kept both alive by the extension agreement he executed; but, as affects his wife, in the interval between the original fixing of the lien and its renewal, she had acquired her homestead interest in the property, that is, about a week after August 23, 1912, which, by all the testimony, still attached on February 15, 1918, the date of the extension agreement, and the husband alone could not then, as against such right in her, renew that lien for indebtedness of his own that had become barred by the four-year statute (Rev. St. art. 5688).

As before stated, by the undisputed proof notes 11 to 15, inclusive, were then so barred, No. 15, the last of these to fall due, having matured November 23, 1913, and the 60 days' grace allowed thereon having expired January 23, 1914. It does not appear when the previously mentioned credit of $122 was made on note No. 11, but that note fell due July 23, 1913; and, assuming the credit to have been paid at that time, there was then on July 17, 1919, out of the $6,807.02 so decreed on that date to be a lien against the interest of both husband and wife in the property, $1,394.74 that represented barred indebtedness accrued on notes 11 to 15, inclusive, calculated in this way: These five notes for $200 each amounted to $1,000, upon which 6 per cent. from August 23, 1912, to July 23, 1913, is figured, yielding a total of $1,055. From that sum is deducted the $122 assumed to have been paid on note No. 11 on that date, leaving $933 on which 6 per cent. annual interest is figured from that date until the date of judgment, July 17, 1919, giving for both principal and interest $1,267.95. Ten per cent. upon that amount, added for attorney's fees, brings the final sum to $1,394.74.

Pursuant to these conclusions there is here substituted for the $6,807.02 so decreed to be a lien as against the title and interest of both Joe and Perfine Benavides in the property the sum of $5,412.28; the judgment entered below in no other respect being changed, but, as so reformed, being in all things affirmed.

Reformed and affirmed.