EMMETT B. COCKE V. JOHN R. CONQUEST ET AL.

No. 5151.   Decided February 18, 1931.
(35 S. W., 2d Series, 673.)

*Dawson, Hill & Walker* and *Emmett B. Cocke,* for plaintiff in error.

The fact that the head of a family uses (and even if he needs to use) the proceeds of the sale of crops grown on a tract of land detached and some miles from the tract which the residence and all other needed and used improvements stands, does not impress that tract of land with the homestead exemption and same is subject to execution. Evans v. Womack, 48 Texas, 232; Sken & Co. v. Olenick, 48 Texas, 199; Brooks v. Chatham, 57 Texas, 35; Blum v. Rogers, 15 S. W., 117; Autry v. Reasor, 108 S. W., 1162; Gleed v. Pickett, 68 S. W., 192; Allen v. Whitaker, 13 S. W., 162.

*Ramsower & Seawell,* for defendants in error.

Mr. Commissioner SHORT delivered the opinion of the court.

The plaintiff in error, Emmett B. Cocke, has sought to appropriate to the satisfaction of a judgment, originally amounting to $6,300 against Lee Conquest, and reduced by the sale of the tract of land on which a vendors lien was foreclosed to about $4,000, besides interest, 188.4 acres of land situated in Hidalgo county, found by the court to be the homestead of the defendants in error, Lee and Minnie Conquest, husband and wife respectively, residents of Hidalgo county and citizens of Texas, which Lee and Minnie Conquest assert to have been their homestead at the time the plaintiff in error sought to appropriate it, in addition to some other lands also belonging to Lee and Minnie Conquest, among the other lands being forty-five acres in several parcels.

However, the suit was originally instituted against the plaintiff in error in the district court of Hidalgo county by Lee Conquest, the said wife, and their son, John R. Conquest, against the plaintiff in error, and a certain constable of that county, who held a pluries execution, and who had levied the same on certain lands as the property of Lee and Minnie Conquest, aggregating as aforesaid about forty-five acres, in which the original plaintiffs, Lee and Minnie Conquest, alleged that they were the original owners on and prior to the 29th day of April, 1925, of the forty-five acres, and on and prior to the 2d day of September, 1925, they were the owners of the remaining aggregate amount of lands of 188.4 acres, each of these aggregate amounts being in several parcels and the several parcels composing the 188.4 being segregated by a distance of several

miles in some instances, the greatest distance being about twelve miles from the fartherest portions and which they alleged that on the 29th day of April they had conveyed to John R. Conquest the first aggregate amount of forty-five acres and on the 2d day of September, 1925, they had conveyed the remainder of said lands, each for a valuable consideration and that the plaintiff in error, Cocke, had filed a judgment lien in Hidalgo county, whereby he sought to appropriate said lands to the satisfaction of said judgment and that the other original defendant, as constable, had levied on the first named forty-five acres and that the filing of the judgment lien in Hidalgo county constituted a cloud upon the title of all the lands. Lee and Minnie Conquest also alleged that the 188.4 acres constituted their homestead at the time the judgment was rendered and the lien sought to be fixed, and asserted homestead rights in said 188.4 acres. The plaintiff in error filed a cross action asserting he had a judgment lien on all of said lands, and that the transactions between Lee and Minnie Conquest on the one hand, and their son on the other, were fraudulent and void.

The original plaintiffs had secured from the district judge an injunction prohibiting the sale of any of these lands, and the case having been tried without the intervention of a jury, the court, after hearing the testimony, rendered judgment in favor of the plaintiff in error, dissolving the writ of injunction as to the amount of lands aggregating forty-five acres, on which the pluries execution had been levied, and established a lien in favor of the plaintiff in error on said lands, and ordered them sold to satisfy said execution. The court perpetuated the injunction as to the 188.4 acres of land, finding as a fact that while said 188.4 acres of land consisted of several segregated tracts, separated by a distance not exceeding twelve miles, that the same constituted the homestead of Lee and Minnie Conquest, and that while the conveyance made to their son was the result of a design on the part of Lee and Minnie Conquest to defraud the plaintiff in error, yet since the lands constituted the rural homestead of Lee and Minnie Conquest at the time they had conveyed it to their son, said fraudulent design was inoperative against them, the court holding under these facts that the temporary injunction as to the 188.4 acres should be perpetuated and entered judgment to this effect.

None of the original plaintiffs appealed from this judgment but the plaintiff in error did, and upon a hearing of the case in the Court of Civil Appeals at San Antonio, that court affirmed the judgment of the district court. 2 S. W. (2d) 992. The case has reached the Supreme Court in the usual way.

The Supreme Court having referred the case to Section B of the Commission of Appeals, it was there submitted on oral argument and the briefs of the parties, and an opinion was written by Judge Speer recommending that the judgment of the Court of Civil Appeals, affirming that

of the district court, be affirmed, which recommendation was, by the Supreme Court, adopted and the judgments of the district court and the Court of Civil Appeals were affirmed. 13 S. W. (2d) 348. However upon a motion for rehearing having been filed it was granted, and the judgment entered by the Supreme Court was set aside. The case has been resubmitted to, and heard by the Supreme Court, and the record has been re-examined.

The plaintiff in error presents the third assignment in his application in the following language: "The Court of Civil Appeals holds in this case that the language of the Constitution reading 'provided that the same shall be used for the purposes of a homestead" applies to lots in town or city but in no manner applies to rural homesteads and thereby, in effect, holds that the head of a rural family is entitled to an exemption of 200 acres of land in every event, whether the same be used for homestead purposes". He submits under this assignment as one of his propositions the following: "Where segregated tracts of land are claimed as rural homestead just such of them only as are used for homestead purposes are exempted".

While the proposition is a correct statement of the law, the record shows clearly that it is not applicable to the facts found by the trial court. That court, among other things, found the following: "I find that when the said suit, meaning the original suit, in which the judgment was rendered in favor of the plaintiff in error against the defendant in error, Lee Conquest (out of which arose this suit), was filed in Bexar county, Lee Conquest owned at least 315 or 320 acres of land, located in Hidalgo county and consisted of a number of separate tracts within a radius of eight miles from the twenty acres on which the residence stood, the greatest distance between any two tracts being about twelve or fourteen miles and all of which land was used by said Conquest for general farming purposes, in exactly the same way, for growing cotton, principally, and in addition he resided on the twenty acre tract above mentioned. * * * I find that on June 13, 1925 (the date of filing an abstract of the judgment), and ever thereafter Lee Conquest was using and continued to use all the lands he then owned in Hidalgo county, including all that in controversy herein, for the purposes of farming and raising and caring for his cattle and that he used the proceeds derived from such use to pay his taxes, debts, interest on debts, living expenses for himself and family, and operating his farms and that he needed same for those purposes." Upon these and other findings the trial court concluded that the lands involved (being less than 200 acres) here used by Lee Conquest for homestead purposes, should be and were exempted to him, and are protected under the Constitution and laws of the state and that he had a right to convey such lands to his co-plaintiff John R. Conquest.

It is the contention of the plaintiff in error that the defendants in

error only have homestead rights in the twenty acres of land upon which they actually resided and that the remaining parcels are subject to be appropriated to the satisfaction of this judgment, rendered in the district court of Bexar county against the defendant in error, Lee Conquest, the husband of Minnie Conquest, and the head of the family. The findings of fact by trial court not being attacked by any assignment of error, we might content ourselves with assuming that the testimony supports them, yet, we deem it proper, in view of the importance of the question under discussion, to set out some of the testimony of the only witness, who was introduced. Among other things this witness, the defendant in error, Lee Conquest, testifying in his own behalf and in behalf of his wife, said:

"As to Lot No. 2 in Block 18,—that land is located three miles south of the McColl clubhouse, at the resaca. That is about four and one-half miles from the place where the dwelling is located on the 20 acres, now in dispute. I owned that land just two years prior to the execution of this deed. (Evidently speaking of the deed to his son, John R. Conquest.) At the time I purchased that land it was pasture land and some brush land. A little had been cleared. I bought it after I moved to this State. I acquired that land after I acquired the twenty acre tract. It was a piece of resaca bed and adjoining the resaca bed, and it was grassed over, and we needed it for pasture. I bought it from parties down there at Pharr and McAllen and I bought it for use for grazing purposes. You can cultivate about half of the forty acres,—about twenty acres. I have put that to raising feed for the cows. I put cane on it and pastured it off. We used it for six months to run the cows on. Then I leased it to another man for the first year, and after the year was up we took charge of it again,—I did myself, with the assistance of a man who stayed on the place and milked the cows. And we used it for the same purpose. I used the proceeds derived from the use of this land in supporting the family. We got half the proceeds after we leased it to that man. The arrangements with that man were that he was to pay $3 a day for the use of the land and the cows. That arrangement continued for one year. That was a temporary arrangement. After that my son and I actually plowed the ground and put in a cane crop. We put a man on there to take care of the cows. The proceeds derived from what was raised on it since this lease expired there were used for living purposes. After the lease expired and when my son and I again occupied the land and used it we used the proceeds from it for the maintenance of the family. It was needed for that purpose.

"As to Lot 88, I got that land the 10th of February, 1922. I contracted for it. If I remember right the deeds are dated at that time. Afterwards I moved down here in September. That was the year 1922. I took charge of it and plowed it up that winter and farmed it. My

son John R. Conquest assisted me with it. He is one of the plaintiffs in this case. I went ahead and with his assistance broke the land out and put it in crops. We put cotton on it and we farmed it all in cotton for two or three years. We used it as a cotton farm, and we handled it ourselves,—myself and the boy, with what help we hired, and we used the proceeds to pay the interest, and taxes, and for living expenses. There was nothing left after that. It never paid anything on the principal. It never has. There is a fraction less than forty acres in that tract. * * * The condition of this land at the time I bought it in 1922 and began cultivation, was that it had been grassed over. It had been idle for some years and was covered with a heavy growth of weeds and vegetation. We cleared it and burned the weeds and plowed it. It was idle land. It hadn't been farmed for a year or so when I got possession of it. We continued that for three years. * * * Lot 88 is about seven and one-half or eight miles from the home place,—the homestead. It is three miles north and one mile west of McAllen. We got back and forth from this place by truck, and we kept a man on the farm while we worked it. * * * The means of locomotion is different now from what it was years back. We can get back and forth much quicker. We have a farm truck. We had no house on that land. I did have some land there with three small houses.

"With reference to Lot 272,—that land is located three miles south of Pharr and a mile east. I acquired that land the 10th day of February, 1922, when I got the other piece,—this 88 acres. That land is paid for in full. I paid $300.00 an acre for that land. At the time I purchased that land in 1922 it was of the same character as the other land. I had to clear that land. It had gone back to brush and had to be broke up. We did break it up ourselves. My son and I did that. My son had something to do with the breaking, but not with the clearing. I hired the clearing done and my son John broke it with the tractor. That was the winter of 1922-1923. And then we farmed it in cotton the following year. * * * We farmed it for two years, my son John and myself, with hired help. But we rented it for a share after we had plowed it. That rental occurred in the winter of 1924-25. We had it rented that summer. That was before the execution of this deed in December. We had it rented out for a share of the crop. We took one-third after we had it plowed and gave the man two-thirds for working it. We had more than we could handle. I had oversight of that. I was on the place every week,—maybe twice or three times a week. This rental began in February, 1925. * * * He took charge and finished putting in the crop where we had broken it up—that is, where John had plowed and broken it out. Yes, that rental began in 1928. Yes, this correction deed to John R. Conquest was made in December, 1925. Yes, that land was still rented after that. The term of the rental was from year to year.

One year at a time. He only had it one year. The next year we had another man on it. We used the proceeds derived from the rental of that land for living expenses and taxes on the land. The proceeds were not used for any other purpose. The proceeds were needed for that purpose. The taxes are just about taking the proceeds of the farm.

"As to Lot 272, it is located four miles southeast from the home tract. Lot 273 lies adjoining 272 on the south. The deed recited 44.56 acres in that, but I have never had that surveyed. It is deeded jointly to me as a double tract, 89 acres of land. Yes, Lots 272 and 273. I acquired both of those tracts on February 10, 1922. I had practically the same use and occupancy of Lot 273 as I did of the former tract. They were side by side and John and myself cleared the land and broke it out at the same time. I rented that land the next two years. Yes, that was rented at the time of the deed to my son John R. Conquest. The land is overflow land and at the time I bought it it had gone back to brush the same as Lot 272, and it had to be cleared before we could break it and farm it. It was done at the same time and under the same contract. * * * It was broken by John R. Conquest after I had hired the brush and trees taken away and burned. John plowed it. We prepared it for a crop and planted it to cotton at planting time. We farmed it during the season and used what we got out of it for living expenses and overhead expenses of the farm. During this time John R. Conquest was living at home at my place. Yes, sir, he was a member of the family. That was before he was married. Yes, I stated that I have no other source of revenue whatever. All this land which you have mentioned to me is suitable for farming and has been used for farming. The proceeds of all that was leased have been applied to the living expenses of my family. Lot 273 is clear of all encumbrance. I paid the same price for it that I did for Lot 272, that is, $300.00 per acre.

"At the time this correction deed was executed my wife and I had selected these lands as our homestead. And at the time this correction deed was made and executed we claimed this land as our homestead.

"With reference to the deed of April 29, 1925, conveying the tracts described in the deed to our son John R. Conquest, the Lot 1 in Block 7, containing 9.08 acres of land mentioned therein, that land is located four miles north of San Juan, right near to the railroad. That is five miles from the home place. I acquired that land on the 10th day of February, 1922. There are four tracts described in that deed. Those four tracts all lie together and contain forty-five and a fraction acres. (This forty-five and a fraction acres is not claimed as a part of the homestead, but the court decreed it to be sold to satisfy the judgment of the plaintiff in error.)"

This testimony further shows that the parcels of land, about which the witness testified, aggregate 188.4 acres and are divided into four par-

cels, one of eighty-nine acres, one of forty acres, one of thirty acres and one of twenty acres. These parcels do not include the parcels which aggregate forty-five and a fraction acres and which the court adjudged to be liable to the satisfaction of the judgment rendered against Lee Conquest in favor of the plaintiff in error.

Section 51, article 16 of the Constitution, in part, is as follows: "The homestead not in a town or city shall consist of no more than 200 acres of land which may be in one or more parcels with the improvements thereon."

Notwithstanding this provision of the Constitution and notwithstanding the unchallenged facts found by the trial court, supported by ample testimony, as shown by that of the only witness who testified orally in the case, and notwithstanding the facts found by the trial court, are approved by the Court of Civil Appeals, it is the contention of the plaintiff in error that the homestead of Lee and Minnie Conquest, husband and wife, shown to be citizens of Texas, is confined to that one of the parcels containing twenty acres, on which they resided at the time the conveyance was made of the remaining parcels, aggregating less than 200 acres, by them to their son, John R. Conquest. This contention cannot be sustained. We know of no well considered authority in Texas which supports it. Separate tracts of land, each claimed and used in connection as a homestead, for homestead purposes, constitute a rural homestead. If these several parcels of land, each of which is shown, by the testimony to have had imposed upon it, the homestead character, had been contiguous to each other, the claim of homestead would not be seriously contested, as to the aggregate amount of the 188.4 acres. However, it is insisted that because these parcels of land are detached from the parcel upon which the residence and out houses are located, notwithstanding their use for homestead purposes, they are not exempt under section 51, article 16 of the Constitution. In Woodward v. Sanger Bros., 246 Fed. Rep., 777, 780, the Circuit Court of Appeals of the Fifth District, Judge Batts delivering the opinion, in discussing this situation, among other things says:

"This provision of the Constitution leaves very little basis for distinction between the homestead consisting of one tract of not more than 200 acres, and one made up of several parcels, aggregating not more than 200 acres. It is, however, a homestead which the Constitution exempts, and not 200 acres of land in the country. A fundamental idea involved is a place of residence. While circumstances might exist which would fix or maintain the homestead character of the land without actual residence, yet residence is normally an element. Whatever of physical difficulty there might be in actually living on more than one tract of land was doubtless under consideration when the quoted provision was incorporated in the fundamental law. At most, only a very small part of 200 acres

of land can be used as a place of actual residence. Whatever effect this actual holding for this purpose may have in impressing the homestead character has not, by the terms of the fundamental law, been confined to the tract of actual domicile. The fundamental law making no distinction, there should be a hesitancy in placing a judicial limitation upon the homestead rights based upon an assumed difference between a homestead of a single tract and a homestead consisting of more than one tract. The head of a family owning several tracts not exceeding 200 acres in the aggregate, living upon one of the tracts, and claiming all as a homestead, the burden of proving one of the tracts not homestead should be upon the person attacking the homestead claim. The presumption should be that all is homestead. * * * Most of the rural homesteads in Texas furnish the means of living as well as the place of living. The law as declared in the Constitution and statutes does not undertake to place any limitation on how the land may be used, other than that it is to be the homestead. There is no warrant for saying that, when a homestead shall be used in the way best calculated to accomplish the purpose of a homestead, it losses its character as a homestead. In perhaps a majority of cases the Texas homestead owner cultivates a part of his homestead land by his own labor and a part through tenants. There is no provision in the Constitution or laws which undertakes to prescribe this or any other method of using it, nor any provision which prescribes this or any other method of using it. * * * The leases referred to in the statement of facts are oral arrangements by which the tenant cultivates the land on shares. The landowner furnishes the land, and the tenant furnishes the labor; the crop is divided. * * * The provisions of the contract are customary and perfectly well understood. The contract ordinarily covers the calendar year. A usual incident is that the landlord is compelled to supervise the farming; he frequently makes 'advances'; he must look after the division of the crop. The arrangement, if properly called a 'lease', is a temporary lease. If a like contract is entered into from year to year, each new contract makes the beginning and the end of a temporary lease. * * * If a person should use his land in the way indicated, if he should thereby get his living, thereby provide himself in kind with corn and wheat needed for his own consumption, thereby provide the oats and fodder needed for the horse which he rides; by what provision of the law is he placed, with reference to the tract or tracts constituting the 200 acres which might have become his homestead, in any different position than he would be in if he had done a little work on each of the tracts with his own hand or by hired labor? The law could make such a difference, and, if made, whether reasonable or not, it would have to be observed. But why should an absurdity be imputed to the law when there is nothing in its terms that would justify or excuse such imputation?"

See also the case In Re Buie, 287 Fed. Rep., 896, wherein Judge

Atwell, speaking for the court, holds that "Where a bankrupt had six tracts of land, aggregating less than 200 acres, on two of which he had his residence and a general store and blacksmith shop, and the others of which he farmed, either personally or through hired help or share crop-pers, his use of all of the tracts was sufficient to impress on them the character of a rural homestead".

The testimony, a part of which we have quoted, shows beyond dispute that Lee Conquest, the owner, had, since his ownership of each parcel of land, personally worked each parcel. These acts of use are clearly sufficient to have impressed the homestead character upon each of the parcels. When the homestead character has been impressed upon a parcel of land the authorities are uniform that thereafter a mere temporary leasing thereof, with no intention of abandonment, is insufficient to remove from the land its homestead character. Medlenka v. Downing, 59 Texas, 32; Farmer v. Hale, 14 Texas Civ. App., 73, 37 S. W., 164, writ of error refused; Gunn v. Wynne, 43 S. W., 290, writ of error refused; Baum v. Williams, 16 Texas Civ. App., 407, 41 S. W., 840, writ of error refused; Ruhl v. Kauffman, 65 Texas, 723; Jacobs v. Hawkins, 63 Texas, 1; Schulz v. Whitham & Co., 27 S. W. (2d) 1093. The homestead right, when fixed, is an estate in land and a creditor has no right in it nor to it as a security. This exemption from forced sale of a homestead is founded upon public policy and must be upheld and enforced, as it should be, and has been scarcely without an exception by the courts of this state, notwithstanding the fact that in doing so they sometimes directly assist a dishonest debtor in wrongfully defeating his creditor. Hargadene v. Whitfield, 71 Texas, 482, 9 S. W., 475.

The framers of our organic law had no thought of exempting two hundred acres of land in the country as a home for each family, upon which its members might reside, when they thought proper, but this exemption is only in the event such lands are used for the purpose of a home. The exemption is not of any definite number of acres, but of the home, and the number of acres is a limitation placed upon that home. As said by the author of Speer's Law of Martial Rights in Texas, par. 463, "Expressions may be found in some of the decisions which seem to indicate that the proviso, with reference to the use of property for home purposes do not apply to the rural homestead. But the better authorities, as well as a proper construction of their language of the section show unmistakably that it does." Brooks v. Chatham, 57 Texas, 31. "Evidently it was the purpose of the framers of our Constitution and the statutes on this subject to give to the wife a shelter for herself and children against the improvidence of the husband and the greed of creditors. It is not for the husband, nor yet for their children, that the law has thus interposed; but, possibly in a measure to ameliorate the burdens imposed upon her by our marital laws". As was said by Justice Moore in Iken

v. Olenick, 42 Texas, 195: "The leading and fundamental idea connected with a homestead is unquestionably associated with that of a place of residence for the family, where the independence and security of a home may be enjoyed, without danger of its loss, or harrassment and disturbance by reason of the improvidence or misfortune of the head, or any other member of the family. It is a secure asylum of which the family cannot be deprived by creditors. Within its sanctuary, however urgent may be their demands, they cannot intrude".

While the facts in the case of Woods v. Alvarado State Bank, 118 Texas, 586, 19 S. W. (2d) 35, are in no wise similar to the facts in this case, yet the Supreme Court, speaking through Chief Justice Cureton, in that case has discussed at some length the history of our homestead laws and the policy of the state as embodied in them, declaring, among other things, that "the rule that homestead laws are to be liberally construed to effectuate their beneficient purpose is one of general acceptation". 29 C. J., p. 787, 13 Ruling Case Law, p. 547; Trawick v. Harris, 8 Texas, 312; Schneider v. Bray, 59 Texas, 668.

As this is the latest expression on the general policy of the state, with reference to its homestead laws, wherein there is a general discussion of them, we pretermit any further discussion of these laws in this case, believing that what is said in the Woods case is sufficiently illuminative of the question, to indicate that the trial court, upon its findings of fact, reached the correct conclusion and that the Court of Civil Appeals correctly affirmed the judgment of that court.

The conclusion we have reached, with reference to the assignment presenting the question we have discussed, renders unnecessary discussion of the other assignments.

For the reasons stated the judgment of the Court of Civil Appeals should be affirmed.

The foregoing is adopted as the opinion of the Supreme Court, and the judgment of the Court of Civil Appeals is affirmed.

C. M. Cureton, Chief Justice.