## P. Baldeschweiler v. B. E. Ship.

### Decided April 6, 1899.

**Homestead—Separate Tracts of Land.**

A rural homestead, which the Constitution permits to consist of one or more parcels of land, provided they are used for the purpose of a home, may embrace a tract of land several miles distant from the one on which the residence is situated, if used for the purpose of supporting the owner and his family in a manner adapted to their condition, whether he works it himself or by a tenant.

Error from Nueces. Tried below before Hon. James B. Wells.

*McCambells & Welch,* for plaintiff in error.

*H. Grass,* for defendant in error.

WILLIAMS, ASSOCIATE JUSTICE.—This writ of error is prosecuted from the judgment of the court below perpetuating an injunction sued out by the defendant in error to restrain the sale of land levied on under an execution against him in favor of plaintiff in error, on the ground that such land was part of his homestead. While the levy was upon two tracts of eleven and 92.35 acres respectively, the question presented here involves only the latter tract, and that question is whether or not it constituted, when levied on, part of the rural homestead of defendant in error. The facts upon which its decision depend are as follows: Defendant in error sold his homestead in Bell County, and in 1893 and 1894 purchased, with the proceeds thereof, three parcels of land in Nueces County, one of forty-four acres, on which he established his residence, another of eleven acres adjoining it, and another, the one in question, about four miles distant from the others. He bought them for the purpose of making them his homestead. His business is that of truck-farmer and gardener, to which he devotes all of his land for the purpose of making a support for his family. He is unable to cultivate the land himself by reason of his age, which was about 68 when the levy was made, and the fact that he has lost an arm and an eye. The arrangement by which he has the land cultivated is thus stated by him, and he is uncontradicted in any material particular.

"Not being able to work it myself, it was a question in my mind what it was better for me to do; whether it was best for me to get Mr. Maupin to labor and farm it, or to rent to him, or to farm with him jointly. He proposed, as he was not able to furnish tools, teams, and feed, to farm it with me. I got him a team, and indorsed for him for it. When the note fell due he was not able to pay it all, only a part of it, and I paid the balance. That was the first year. I furnished him tools, that is, the greater part of the tools; that is, plows, cultivators, planters, etc. He perhaps got tools in addition, but I am not certain. To the best of my recollection, I furnished two plows, a cultivator, and a planter, and I furnished him seed to plant the first year, on the condition that he would pay me back when he made the money.

"He was to turn over to me one-third of the crop. He was to farm it and cultivate it, and I was to be at no expense, as I have stated, except what I said I furnished. The understanding between him and me was that he was to gather it and deliver it to my house, if I wanted it there, or to the depot, or to the stores in town, or, if I wanted him to do so, to ship my stuff off with his. To some extent the crop was optional with him, but he was to plant cabbage, beans, onions, etc., at the times when those crops are planted here. We agreed between us that he should plant a crop of broom-corn, and he planted I don't know how many acres of broom-corn, and some other corn, besides the other stuff I speak of. The first broom-corn that was raised, we sold a portion of it to Mr. Osborn in town; he worked up a part of that crop. We sold it for so much a pound. We were not satisfied with Mr. Osborne's work, as he worked too slow, so

we agreed to buy the factory and take up to the farm. I got that portion of the broom-corn, for Mr. Maupin turned me over one-third of the brooms, and I paid him what was right for making them. He delivered one-third of the brooms to me. He sold some of them with my consent, and paid me the money, because I could not sell them here. The balance were delivered to me, and I sold them here in town for money and groceries; that is, where I couldn't get money, I took groceries to live on. Other portions of the crop were delivered at my house. Some of it was not, because cabbage, beans, etc.; were raised for market. There was some corn delivered at my house, and this year he delivered my one-third of the fodder. I have no other support besides what I derive from those three tracts of land. * * * I claim it as part of my homestead. I bought it for that purpose, as I could not get land enough adjoining my home place for my support, and I have so used it ever since.

"As to whether you would call Mr. Maupin a tenant or working on shares, he is a tenant, as I have stated. He has control after I rent the land to him, and I rent it to him for one-third of what is produced in crop and produce. The rental is by the year. I have rented to him every year, and each time it was for a year. I have no power to go there and discharge him as a hired hand during the year. He occupies the improvements, house, etc., with his family. He has absolute control, but agrees to do so and so. These contracts of rental from year to year are verbal. We have talked of drawing up writings, but have never done it. He has paid out the teams since he went there, but not the tools; by tools I mean agricultural implements.

"We have a settlement every year when the crop comes in. When brooms are made there, I pay him for making the brooms out of my one-third. We own the factory jointly. He runs it with his son. He works his own corn up for himself, and when he works up mine, I pay his son for it."

The eleven acres are farmed under the same kind of an arrangement with another person.

Demurrers were urged to the petition on the ground that the facts stated were not sufficient to show the exemption claimed. We think the petition stated the facts which were developed by the evidence, and that there was no material variance between the allegations and the proof.

We are further of the opinion that the facts proven were sufficient to establish the exemption. That the tract in question was four miles from the residence is not decisive. Being separate from the tract on which the residence was situated, it of course did not become a part of the homestead merely because there were less than 200 acres in all. To impress it with that character it must have been used for "the purposes of a home," in the language of the Constitution. It is also true that the phrase referred to is not restricted in its meaning to the use of the property as a mere residence or habitation. "The idea of a home or residence in the country imports that there is conneceted with it the means and opportunity of following the pursuits of the country. The mere exemption of

the residence would ordinarily be of little benefit to the family, as it would probably have to be abandoned and the family go elsewhere to find employment from which to realize a support. The homestead exemption in the country was therefore extended so as to include 200 acres of the land previously occupied, appropriated, and used in connection with it. The land thus exempted is evidently incident and appendant to, and from the nature of the case forms a part of the country homestead." Iken v. Olenich, 42 Texas, 199.

The Constitution, when it permits the homestead to consist of one or more parcels provided they are used for the purpose of a home, does not mean that the parcels must be a mere appendage or incident of the residence; but the purposes referred to include all such as the land is properly put to by the head of the family in following a country pursuit and thereby securing to his family not only a dwelling place but the means necessary to its enjoyment. The mere fact that means realized from the use of the property, separated from that upon which residence is situated, are used in supporting the family is not claimed, of itself, to work the exemption in all cases. But where all the land is employed by the head of the family in the pursuit of his business appropriate to the country, such as farming, and used together for the same purpose of sustaining the family in the home, we can see no reason for saying that it is not all exempt. Nor can we see that the character of the arrangement by which he utilizes it for such purposes, whether by his own labor, by that of hired hands, or of tenants should be made decisive. By any or all of these methods of farming the land may be made the means of maintaining the home and supporting the family. To constitute a designation as part of the homestead of a tract separated from the place of residence, "There must be something more than mere intention; there must be some act done which will evince an intention to use it as a home, or * * * to use it, in some way, in connection with the home place, for the comfort, convenience, or support of the family. * * * Such designation must consist in the use of the detached parcel or parcels, in connection with the home place, or in such preparation to so use as will clearly evidence the intention to so use; but this must vary according to the character of the detached parcel or land and the purpose for which it is adapted and for which it is intended." Brooks v. Chatham, 57 Texas, 33, 34.

The land here in question was actually used in the same way and for the same purposes as that upon which the party lived. All was done under a scheme devised by which it might best be made available for the support of the family. This manner of use was adapted to his condition and that of the family, and was one to which the property was adapted. In our opinion it was such as to make that connection with the use of the home itself which the Constitution and the decisions require. Pridgen v. Warn, 79 Texas, 588.

*Affirmed.*