PAINEWEBBER INC. and Admiral Insurance Co., Appellants,

v.

Michael F. MURRAY, Appellee.

Nos. 3:98–CV–0046, 3:98–CV–0047.

United States District Court, E.D. Texas, Paris Division.

March 30, 2001.

Peter Clifton Lewis, Walker, Bright & Whittendon PC, Dallas, TX, for Paine-Webber.

Steven Charles Malin, Malin & Malin PC, McKinney, TX, for Admiral Insurance.

Christopher James Moser, Quilling, Selander Cummiskey & Lownds PC, Dallas, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

SCHELL, District Judge.

Creditor–Appellants Painewebber, Inc. and Admiral Insurance Co. (the "Creditors") both appeal from an order of the bankruptcy court overruling their objections to Debtor–Appellee Michael F. Murray's ("Murray") claimed homestead exemption. Furthermore, they seek review of Murray's Schedule C, specifically his claimed exemptions of a tractor, a riding lawn mower, and a 1992 pickup truck. Under 28 U.S.C. § 158, this district court has jurisdiction over this appeal. For the reasons discussed below, the order of the bankruptcy court is AFFIRMED.

## I. BACKGROUND

Murray owns three tracts of land located approximately five miles outside of Telephone, Texas, in Fannin County, which are zoned for agricultural use. Two of the tracts, a 33 acre plot and one 15 acre plot, are contiguous, but a third tract of 147 acres is about a half mile from the other two tracts. A mobile home sits on the 33 acre tract, and such services as utilities and fire and police protection are provided to the site by Fannin County.

Initially, Murray used the 33 acre tract and the mobile home as a hunting lodge. When he retired in 1992 from his job as a stockbroker in Dallas, he began to reside on the 33 acre tract on a permanent basis.

Since 1992, Murray has claimed this and the other two tracts as his homestead.

While living on the properties, Murray has, individually or through the help of another, fanned wheat, soybeans, or hay on the properties. On certain occasions, he has leased some of the tracts to a neighbor and entered into a sharecropping arrangement. After accounting for depreciation, however, Murray has made no money on his farming operations. Presently, Murray continues to grow hay on the 33 and 15 acre tracts to supplement his income and to barter for other goods. In addition, he often cuts wood from all three properties, particularly the 147 acre tract. Besides farming related activities, Murray and his wife, the former Gwendolyn Atkinson ("Atkinson") (collectively "the Murrays"), have used the three tracts for various other purposes, including gardening on the 33 acre tract, fishing on the 15 acre tract, and using all three properties for recreational and aesthetic activities such as bird watching and picnicking.

The Murrays were married in 1996. Prior to the marriage, the two signed a prenuptial agreement delineating the lack of obligation on the part of each spouse to support the other. Moreover, each spouse waived and released any homestead rights to the other's separate property. Furthermore, Atkinson apparently claimed a residence in Highland Park, Texas, as her homestead for ad valorem tax purposes in 1996 and 1997.

On December 2, 1997, Murray filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Atkinson, however, did not join in the petition. Among the items that Murray included in his Second Amended Schedule C of exemptions were the three separate tracts of real property. Murray also claimed a tractor, a riding lawn mower, and a 1992 pickup truck as

exempt farming equipment. In late January and early February of 1998, the Creditors objected to these claimed exemptions, and a hearing was held before the bankruptcy judge on May 6, 1998. After hearing testimony from Murray and Atkinson, the bankruptcy judge overruled most of the Creditors' objections and entered on the record his findings of fact and conclusions of law. Subsequently, the bankruptcy judge filed an order memorializing those rulings.

The Creditors timely appeal and raise the following issues for review:

a) Is [Murray] entitled to exempt all real property and a mobile home listed on his Schedule C (of exemptions), as amended, as a rural homestead under Texas Property Code §§ 41.001 and 41.002?

b) Is [Murray] entitled to exempt a tractor, riding lawn mower, and a 1992 truck listed on his Schedule C of exemptions, as amended, as "farming or ranching vehicles and implements" under Texas Property Code § 42.001(a)(3)?

c) Is [Murray] the "head" of his family for purposes of his rural homestead exemption claim under Texas Property Code §§ 41.001 and 41.002?

d) Does all of the real property described in [Murray's] Schedule C "support" his family for purposes of [Murray's] rural homestead exemption claim? [1]

Because issues "c" and "d" are necessarily subsumed under issue "a," the court will

address those issues together before discussing issue "b."

## II. STANDARD OF REVIEW

 A district court reviews a bankruptcy court's legal conclusions de novo.[2] But a bankruptcy court's findings of fact are subject to the clearly erroneous standard.[3] "According to this deferential standard, [a court] should overturn the factual findings of [a] bankruptcy court only when, after review of all the evidence, [the court is] left with a 'firm and definite conviction' that the bankruptcy court committed a mistake." [4] Nevertheless, where a finding of fact is premised on an improper legal standard, it "loses the insulation of the clearly erroneous rule." [5]

## III. ANALYSIS

### A. Murray May Exempt the Three Tracts and the Mobile Home as a Rural Homestead

The Creditors' first issue on appeal is whether Murray may exempt the three tracts and the mobile home as a rural homestead under Texas Property Code §§ 41.001 and 41.002. Implicit to this issue are two other issues raised by the Creditors: 1) whether Murray is the head of his family for purposes of the rural homestead exemption and 2) whether all of Murray's properties support his family.

 Homestead exemptions in Texas have their origins in both constitutional [6]

---

1. *See* Appellants' Designation of Items to Be Included in R. on Appeal & Statement of Issues at 3.

2. *See Kennard v. MBank Waco, N.A. (In re Kennard),* 970 F.2d 1455, 1458 (5th Cir.1992).

3. *See id.* at 1457.

4. *Bradley v. Pacific Southwest Bank (In re Bradley),* 960 F.2d 502, 507 (5th Cir.1992).

5. *See id.* (quoting *In re Missionary Baptist Found.,* 712 F.2d 206, 209 (5th Cir.1983)) (internal quotation marks omitted).

6. Article XVI, § 50 of the Texas Constitution protects the homestead of a family, or of a single adult, from forced sale for the payment of certain debts.

and statutory provisions.[7] When interpreting these provisions, a court must liberally construe them to protect the homestead.[8] Indeed, a court "must uphold and enforce the Texas homestead laws even though in so doing [the court] might unwittingly 'assist a dishonest debtor in wrongfully defeating his creditor.' "[9]

▇▇▇▇ Under Texas law, a family or single adult may claim either a rural or urban homestead.[10] Section 41.002(a) of the Texas Property Code states that an urban homestead claimant may exempt up to one acre of property if it is used for the purposes of a home or for a business.[11] Accordingly, an urban homestead may be comprised of a residential and/or business homestead. On the other hand, the rural homestead exemption does not include a business homestead component.[12] Instead, § 41.002(b) allows a family or single adult to claim up to 200 or 100 acres of property, respectively, for the purposes of a rural home.[13]

▇▇▇▇ Whether a homestead is rural or urban is a question of fact.[14] Section 41.002(c) provides that "[a] homestead is considered to be rural if, at the time the designation is made, the property is not served by municipal utilities and fire and police protection." The Fifth Circuit, however, has interpreted this provision as clarifying the test to determine homestead status rather than as a definitive measure of whether some property is rural or urban. Accordingly, § 41.002(c) is but one of many factors that a court may consider to determine whether a homestead is rural or urban.[15] Other factors include: "(1) the location of the land with respect to the limits of the municipality; (2) the situs of the lot in question; (3) the existence of municipal utilities and services; (4) the use of the lot and adjacent property; and (5) the presence of platted streets, blocks, and the like." [16]

▇▇▇▇ In addition to claiming rural or urban property, a homestead claimant has the burden of establishing that his property qualifies as a homestead.[17] "Mere ownership or possessory interest is not of itself

7. Section 41.001 of the Texas Property Code exempts homesteads from seizure for the claims of creditors except for encumbrances properly fixed on homestead property.

8. *See In re Cole*, 205 B.R. 382, 384 (Bankr. E.D.Tex.1997); *Woods v. Alvarado State Bank*, 118 Tex. 586, 19 S.W.2d 35, 35 (1929).

9. *In re Bradley*, 960 F.2d at 507 (quoting *Cocke v. Conquest*, 120 Tex. 43, 35 S.W.2d 673, 678 (1931)).

10. *See R.B. Spencer & Co. v. Green*, 203 S.W.2d 957, 959 (Tex.Civ.App.—El Paso 1947, no writ).

11. Section 41.002(a) provides:

 (a) If used for the purposes of an urban home or as a place to exercise a calling or business in the same urban area, the homestead of a family or a single, adult person, not otherwise entitled to a homestead, shall consist of not more than one acre of land

which may be in one or more lots, together with any improvements thereon.

12. *In re Bradley*, 960 F.2d at 506 n. 6.

13. Section 41.002(b) states:

 (b) If used for the purposes of a rural home, the homestead shall consist of:
 (1) for a family, not more than 200 acres, which may be in one or more parcels, with the improvements thereon; or
 (2) for a single, adult person, not otherwise entitled to homestead, not more than 100 acres, which may be in one or more parcels, with the improvements thereon.

14. *United States v. Blakeman*, 997 F.2d 1084, 1090 (5th Cir.1992)

15. *See id.* at 1091.

16. *In re Bradley*, 960 F.2d at 512 n. 18.

17. *See id.* at 507.

sufficient to establish a homestead."[18] A claimant must show "both (i) overt acts of homestead usage and (ii) the intention on [his] part ... to claim the land as a homestead."[19] Although some courts have required that the claimant reside on part of the property,[20] others have held otherwise so long as there is a "bona fide intention to dedicate the property as a homestead, accompanied with such acts of preparation sufficient to amount to notice of a dedication."[21] And a court generally need not investigate intent when the land is actually put to homestead use because that is "the most satisfactory and convincing evidence of intention."[22]

Thus, for Murray to show that the three tracts of land qualify for the homestead exemption, four things are required. First, the tracts must be rural in nature.[23] Second, Murray must qualify as the head of a family given that he claims more than 100 acres as exempt homestead. Third, Murray must demonstrate overt acts of homestead usage consistent with a rural home. Finally, Murray must have the intent to claim the three tracts as his homestead. Because the Creditors either concede or do not question the first and last requirements,[24] the court need only address whether the second and third requirements have been met.

### 1. Murray Is the Head of a Family for Rural Homestead Purposes

■ Notwithstanding the bankruptcy court's conclusion to the contrary, the Creditors contend that Murray cannot claim the 200 acre family exemption for rural homesteads because Murray and his wife are not a family for purposes of the rural homestead. Although a husband and wife form a traditional type of family, Texas courts since *Roco v. Green*[25] have held 1) that the family relation is one of status, not of mere contract, 2) that the head of the family must have a legal or moral obligation to support the other members, and 3) that there must be a corresponding state of dependence on the part of the other members for this support.[26]

The first prong of the *Roco* test requires that the family relation be of status rather than of contract. At least one court has defined this as requiring a group of people to live together subject to one domestic

---

**18.** *In re Mitchell* 132 B.R. 553, 558 (Bankr. W.D.Tex.1991).

**19.** *In re Kennard,* 970 F.2d at 1458.

**20.** *See, e.g., Fajkus v. First Nat'l Bank,* 735 S.W.2d 882, 884 (Tex.App.—Austin 1987, writ denied); *NCNB Texas Nat'l Bank v. Carpenter,* 849 S.W.2d 875, 879 (Tex.App.—Fort Worth 1993, no writ) (citing *Fajkus*); *Ratliff v. Smith,* 178 S.W.2d 138, 140 (Tex.Civ.App.—El Paso 1943, writ ref'd).

**21.** *Bartels v. Huff,* 67 S.W.2d 411, 412 (Tex. Civ.App.—San Antonio 1933, writ ref'd); *see also Clark v. Salinas,* 626 S.W.2d 118, 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); *Lilly v. Lewis,* 249 S.W. 1095, 1096 (Tex.Civ.App.—San Antonio 1923, writ dism'd w.o.j.); *Exall v. Security Mortgage & Trust Co.,* 15 Tex.Civ.App. 643, 39 S.W. 959, 960 (1897, writ ref'd).

**22.** *Youngblood, v. Youngblood,* 124 Tex. 184, 76 S.W.2d 759, 761 (1934).

**23.** *See Fajkus,* 735 S.W.2d at 884.

**24.** *See, e.g.,* Reply Br. of Appellants Painewebber & Admiral Ins. ("Appellants do not ... contest the fact that Murray's property is rural by definition.").

**25.** 50 Tex. 483, 490 (1878).

**26.** *See id.; Henry S. Miller Co. v. Shoaf,* 434 S.W.2d 243, 244 (Tex.Civ.App.—Eastland 1968, writ ref'd n.r.e.) (quoting *Central Life Assurance Soc'y v. Gray,* 32 S.W.2d 259, 260 (Tex.Civ.App.—Waco 1930, writ ref'd)); *see also Zielinski v. Hill (In re Hill),* 972 F.2d 116, 119 (5th Cir.1992).

government.[27] Because the Murrays eat, sleep, and live together on the three tracts, they likely satisfy this definition. Most courts, though, have generally disregarded *Roco's* first prong, concluding that the existence of prong two establishes prong one.[28]

The second prong requires that the head of the household have a moral or legal obligation to support the other members of the family. In the present case, Atkinson testified that Murray is the head of the household, a point the Creditors do not directly dispute. But they do deny that Murray has an obligation to support his wife. The Creditors refer to a property settlement agreement that Murray and Atkinson signed prior to their marriage. The record on appeal does not include this premarital agreement, but it does include testimony by Murray and his wife regarding that document. Murray testified that the agreement stated that neither he nor his wife would be obligated to support the other during the marriage and that both he and his wife waived any common law or statutory right for support. In fact, Murray's wife specifically waived spousal homestead rights under the premarital agreement.

Despite these explicit provisions, the agreement's legal import is unclear. As the bankruptcy court noted, premarital agreements are "in terms of legal precedent and legal development, a relatively recent phenomenon."[29] Only in 1987 did Texas adopt the Uniform Premarital Agreement Act. That act was codified at §§ 5.41–5.56 of the Texas Family Code, which were later superseded in 1997. Nevertheless, the sections pertinent to this case have remained the same. At the time the Murrays negotiated their settlement agreement, former § 5.43[30] provided that parties to a premarital agreement could contract with respect to a number of items including the rights and obligations of the parties to any community and separate property and the disposition of such property in the event of separation. In addition, that section allowed contracting with regards to "any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." Here, the settlement agreement goes beyond the division of community and separate property and includes language delineating the lack of obligation on the part of each spouse to support the other. This latter language is troublesome considering the regard Texas has for the marital union. First, Texas considers a marriage a status, not a contract.[31] Second, a husband normally has certain duties and obligations towards his spouse.[32] Hence, a premarital agreement

27. *See Shoaf,* 434 S.W.2d at 244 (quoting law review article).

28. *See, e.g., In re Hill,* 972 F.2d at 122 ("[First] prong is satisfied by a legal or moral obligation....").

29. Tr. of Proceedings at 117.

30. Virtually the same provision is now at section 4.003 of the Texas Family Code.

31. *See McGinley v. McGinley,* 295 S.W.2d 913, 915 (Tex.Civ.App.—Galveston 1956, no writ).

32. *See Lewis v. Lewis,* No. 01–98–00354–CV, 1999 WL 442176 (Tex.App.—Houston [1st Dist.] July 1, 1999, no pet. h.) ("A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse."); *MacDonald v. Trammell,* 163 Tex. 352, 356 S.W.2d 143, 145 (1962) ("Among the mutual marital rights and obligations is the right of one spouse to the society, comfort, affection and assistance of the other."); *Rylee v. Rylee,* 244 S.W.2d 717, 718 (Tex.Civ.App.— El Paso 1951, no writ) ("It was the legal duty of defendant to support his wife while the marriage existed....").

limiting one spouse's obligation to support the other may contravene public policy and may be ineffective. In that case, Murray would still have a legal obligation to support his wife despite the explicit language of the premarital agreement.

As for the premarital agreement's homestead waiver, that too may not affect Murray's ability to obtain a family homestead. Under Texas homestead law, when the head of the household dies, the surviving spouse maintains the same homestead rights as both spouses had prior to the death of the other.[33] A premarital agreement may include a provision waiving those rights.[34] If a claimant's spouse waives those future rights, that should not affect a claimant's ability to claim a present family homestead.

The Creditors, however, deny that the waiver of homestead rights in the Murrays' premarital agreement is an attempt to waive the surviving spouse's future rights in the homestead. They suggest that the waiver of homestead rights belies the Murrays' desire to maintain individual homesteads. Consequently, the Creditors argue that Murray should not be allowed to claim a family rural homestead and that the court should disregard Atkinson's alleged uses of the three properties.

The Creditors do not cite any legal authority to support their position, and the court is aware of none. Although they quote several items from Atkinson's and Murray's testimonies at the exemption hearing, those statements do not buttress their contentions. First, the fact that

Murray and Atkinson may have entered the premarital agreement to keep their finances separate does not rule out the possibility or the probability that the homestead waiver is an attempt to limit the surviving spouse's life estate. There is no conclusive evidence that the waiver was a means for both Murray and Atkinson to maintain separate individual homesteads. Second, a family rural homestead is available to those who qualify as a family under the *Roco* factors, who live in rural property, who have the intent to establish a homestead, and who commit overt acts of homestead usage. If those requirements are met, then a claimant may have a rural family homestead. Any desire to keep assets separate does not necessarily defeat the existence of a family or prohibit the head of that family from claiming a homestead. The homestead waiver may be evidence, as the Creditors suggest, that Atkinson and Murray are not a family, but it is not conclusive. Third, a family may claim only one homestead.

> As long as the relation of husband and wife exists, [the husband] cannot acquire a homestead different from that of his wife. They are constituent members of the same family. The title to the land composing the homestead may be the separate property of either the husband or wife, or community property.[35]

Thus, whatever Atkinson's and Murray's intentions at the time of the premarital agreement, those two can only have one homestead. Currently, they have chosen the three tracts outside Telephone rather than the Highland Park home.[36]

---

**33.** *See Border v. McDaniel* (*In re Daniel*), 70 F.3d 841, 844 (5th Cir.1995) (quoting *Hunter v. Clark*, 687 S.W.2d 811, 813 (Tex.App.—San Antonio 1985, no writ)).

**34.** *See Williams v. Williams*, 569 S.W.2d 867, 870 (Tex.1978).

**35.** *Crowder v. Union Nat'l Bank*, 114 Tex. 34, 261 S.W. 375, 377 (1924).

**36.** Although Atkinson may have at one time claimed the Highland Park home as her homestead for ad valorem tax purposes, she appears to endorse the three tracts as her present homestead. Her testimony at the ex-

Even if the premarital agreement limited Murray's legal obligations, that agreement nevertheless failed to eliminate his moral obligations. First, the agreement did not specifically state that moral obligations were abolished. Second, a moral obligation encompasses something outside the legal strata and may not necessarily be bargained away via contract. It relates to ethical judgments and principles of right and wrong and is beyond the strictures of the law.[37] Murray testified that he felt an obligation to support his wife while she stated that he gave her moral support. Thus, the fact that Murray may have limited his legal obligations or that Atkinson waived her statutory or common law rights does not affect any moral obligation on the part of Murray.

But the Creditors claim that a moral obligation exists only when there is a necessity for support.[38] They contend that Murray's wife does not need any support because she has greater wealth. For support, they cite to *NCNB Texas National Bank v. Carpenter*,[39] which itself refers to another case *Henry S. Miller Co. v. Shoaf*.[40]

*Shoaf* concerned the appeal of a trial court's jury instructions. Those instructions read, "[T]here is a moral obligation on the part of an adult daughter to support and care for her mother when there is a necessity for such care and support, but that the necessity for such care and support need not be absolute in order to give rise to such moral obligation."[41] The appellants in *Shoaf* argued that the "need not be absolute" language would permit a jury to find any degree of necessity to suffice for a moral obligation. Their precise issue on appeal was whether in light of the phrase "need not be absolute," the trial court erred in not including an instruction that the "care and support must be substantial."

Although the wording of that appeal and the *Shoaf* court's eventual affirmance of the trial court judgment imply an acceptance of the remaining portions of the jury instructions, this court concludes otherwise. First, the *Shoaf* court never specifically concluded that a moral obligation for support exists when there is a necessity for support. Second, in affirming the trial court's judgment, the *Shoaf* court referred to its discussion of *Central Life Assurance Society (Mutual) v. Gray*.[42] That case held that the social status of a family exists between a brother and sister "when there is a moral obligation on the part of the brother to support and care for his sister

---

emption hearing on behalf of her husband supports that view. Furthermore, Texas case law has for years held that the husband is the head of the household and that his declaration of a homestead binds the wife and the family. *See Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 569 (Tex.1972); *Skiles v. Shropshire*, 124 Tex. 462, 77 S.W.2d 872, 873 (1935); *Arlin Properties, Inc. v. Utz*, 465 S.W.2d 231, 233 (Tex.Civ.App.—Fort Worth 1971, no writ); *City of El Paso v. Long*, 209 S.W.2d 950, 954 (Tex.Civ.App.—El Paso 1947, writ ref. n.r.e.); *Wallingford v. Bowen*, 104 S.W.2d 188, 190 (Tex.Civ.App.—Amarillo 1937, no writ). Thus, Murray's declaration would control over any decision by Atkinson.

**37.** *See* Merriam–Webster's Collegiate Dictionary 756 (10th ed.1998).

**38.** *See* Br. of Appellants Paine Webber & Admiral Ins. at 14 & 17 [hereinafter Br. of Appellants].

**39.** 849 S.W.2d at 879–80 ("A moral obligation for support and care exists where there is a necessity for such care and support, although that necessity need not be absolute.").

**40.** 434 S.W.2d at 245.

**41.** *Id.*

**42.** 32 S.W.2d 259 (Tex.Civ.App.—Waco 1930, writ ref'd).

and when the necessity for such care and support exists."[43] Beyond quoting this statement from *Gray,* the *Shoaf* court did not mention any part of *Gray* that would imply that a moral obligation for support exists only when there is a necessity for support. Indeed, *Gray* states no such proposition. Rather *Gray* merely restated the second and third prongs of the *Roco* test. In light of these facts, the court finds that *Shoaf* lends no support to *Carpenter* 's holding, that *Carpenter* is inapposite to the case at hand, and that the Creditors' definition of moral obligation is contrary to Texas law. Accordingly, Murray has a moral obligation to support his wife and, therefore, satisfies the second prong of the *Roco* test.

 The third *Roco* factor requires that there be a corresponding state of dependence on the part of Atkinson for Murray's support. That dependence need not be absolute.[44] In *In re Hill,* the Fifth Circuit held that dependence exists if " 'but for' such support the recipient's position would be altered."[45] The *Hill* court further found that moral support alone would not be enough to fulfill the third prong unless the case involved minor children or an elderly parent who without help would be in poverty. Here, the testimony shows that Murray pays for most of the household bills at the three tracts. Although Atkinson has a good deal of wealth, that does not change the fact that her position would be altered "but for" Murray's support. She lives on the three tracts purchased by Murray, uses utilities paid for by Murray, burns the wood chopped by Murray, and likely eats the food bought by Murray. Atkinson's own funds could ultimately provide for her welfare, but that does not mean that Murray's support currently has no effect on her standard of living. Thus, the court concludes that the Murrays satisfy the third prong of the *Roco* test and are a family under Texas law.

Accordingly, the bankruptcy court did not commit reversible error when it found that Murray and his wife constitute a family and, thereby, allowed Murray to designate up to 200 acres as the head of a family.

### 2. *Murray Uses the Three Tracts for the Purposes of a Rural Home*

 The Creditors' second main argument is that Murray failed to use the three tracts to support his family. The gist of their argument is that Murray has not demonstrated overt acts of homestead usage on the three tracts. When describing overt acts in this context, courts have routinely required a claimant to use the property for the purposes of a home.[46] And where, as in this case, the property is rural, the acts must be for the purposes of a rural home.[47] What those rural purposes are remains an unsettled issue. Despite an abundance of homestead law cases, Texas courts have never definitively articulated nor consistently applied a single test to determine whether something is a rural purpose.

Relying on a number of cases, the Creditors argue that a rural purpose is one that supports the family. But similar to rural

---

43. *Id.* at 260.

44. *See id.* at 261.

45. 972 F.2d at 121.

46. *See Carpenter,* 849 S.W.2d at 879; *Fajkus,* 735 S.W.2d at 884; *see also Clark,* 626 S.W.2d at 120; *Sims v. Beeson,* 545 S.W.2d 262, 263 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.); *Youngblood,* 76 S.W.2d at 761; *Autry,* 113 S.W. at 748.

47. *See* Tex.Prop.Code § 41.002(b) (Vernon 1998).

purposes, courts have not conclusively defined "support." In the present case, the bankruptcy court held that a rural homestead could "support the home aesthetically,"[48] "as a haven to go to and relax,"[49] "as a surrounding area for recreational activities,"[50] and "in many ways other than simply the return of a profit that one can use in the home."[51] The Creditors, though, take this much further, arguing that support means economic support and that property that does not economically support the family cannot be a homestead.

To uphold their argument, the Creditors cite to a number of cases, but none of them specifically use the term "economic." Those cases merely state the general proposition that a rural homestead is used for the support of the debtor and the family. No court appears to have ruled that a rural homestead must "economically" support the claimant and his or her family. On the other hand, at least two courts, including the bankruptcy court below, have explicitly found that Texas law does not demand an economic support test.[52]

■ The bankruptcy court interpreted the Creditors' economic support test as incorporating a profit/loss component. Throughout the exemption hearing, the Creditors attempted to portray Murray's farming activities as a losing proposition by reviewing his 1994 to 1996 tax forms and showing no profit from those activities. But as the bankruptcy court deftly pointed out, if profit were to be the barometer of an economic support test, then the result would be nonsensical. Under a profit/loss approach, a claimant would have a homestead when he made money while he would not have a homestead when he lost money. That kind of bottom-line accounting would be contrary to the purpose of homestead law, which aims to protect a family's home in times of economic distress. The only people who would satisfy the requirements for a homestead would be those with the least need for that protection. Furthermore, this method of defining support can mistake a paper loss for reality. As Murray discerned from his income tax papers, one of his returns included a depreciation charge that reduced his alleged farming income to a loss. The vagaries of accounting may sometimes mask or fail to capture the realities of everyday living, particularly in the country. The court can envision a family that farms and loses money yet survives through bartering, living off their own products, and borrowing. That family, though, would not satisfy the Creditors' test.

Realizing the unreasonableness of a profit/loss approach, the Creditors recede from that position in their briefs.[53] They now claim that the term "economic" merely requires that the property provide a "means of livelihood." Yet, of the cases that they mention, most either restate the proposition that a rural homestead must support the family[54] or provide examples

48. Tr. of Proceedings at 118.

49. *Id.*

50. *Id.*

51. *Id.*

52. *See In re McCain,* 160 B.R. 933, 938 (Bankr.E.D.Tex.1993) ("There is no requirement in either the Texas Constitution or relevant statutes which obligate a rural homestead claimant to derive economic support from the land claimed as homestead...."); *In re Mitchell,* 132 B.R. 553 (Bankr.W.D.Tex. 1991) (finding that economic support is only one of many permissible uses for a home).

53. *See* Br. of Appellants at 11 ("[Support] does not, however, necessarily imply a dollar return.").

54. *See Ratliff,* 178 S.W.2d at 140 ("Dedication of a rural homestead is accomplished by occupancy thereof by the head of the family as a

of activities that constitute a rural purpose.[55] These cases do not necessarily clarify nor aid the Creditors' desired interpretation.

*In re Spencer*[56] is the only case cited that uses the term "means" in the context of an alleged rural homestead. But even that case does not actually define the meaning of support. Moreover, the *Spencer* case is inapposite to the case at hand. *Spencer* concerned a country estate, a term invented by the adjudicating court to describe a home in a housing development that was intended to give urban homeowners an opportunity to live in the country. Here, Murray's home is a mobile home far removed from any other housing. In addition, there was no evidence in *Spencer* that the debtors conducted any kind of activities other than residential ones. That is not the case with Murray and his wife. Finally, *Spencer* blurs the distinction between the rural characterization requirement and the overt acts requirement by conflating the two. As a result, the holding is not attuned to

either requirement and is too limited to apply as a general test for interpreting these requirements.

The fact remains that Texas courts have generally defined support and, thus, rural purposes by alluding to examples, not all of which suggest an economic benefit. Many cases consider support in terms of economically beneficial activities such as cultivating crops, chopping firewood, or ranching, but others imply that non-economic activities may suffice to establish a homestead.[57] For example, the case of *In re Mitchell* exhaustively reviewed Texas case law and concluded that economic support, whatever that may be, was just one permissible use. It held that the "use of the land for shelter and protection, comfort, convenience, and enjoyment of the home" could constitute support for purposes of the rural homestead exemption.[58] Indeed, at least one decision of the Texas Supreme Court suggests that the very act of establishing a home on rural property may be enough to establish a rural homestead.[59]

---

place of residence and the use thereof for the support of the family."); *Vaden v. Collier*, 253 S.W. 889, 891 (Tex.Civ.App.—Fort Worth 1923, no writ) ("A rural homestead may consist of separate tracts of land, if they do not include more than 200 acres, provided one tract is used as a place of residence for the family and the others are used for the purpose of supporting the family."); *In re Cole*, 205 B.R. at 384 ("Rural homestead was defined in *In re Spencer*, in which the court stated 'it is land that must be used for a residence and the balance of the tract for the support of the family.' ").

55. *See Bradley*, 960 F.2d at 508 ("Texas courts have routinely held that use of property for farming or ranching purposes, accompanied by occupancy of the property, is sufficient to imbue the property with a homestead character."); *Clark*, 626 S.W.2d at 120 ("The proof of a homestead must show use for some purpose of a home, such use as a residence or as a place to cultivate crops or cut firewood for the claimant's personal consumption."); *Sims*, 545 S.W.2d at 263–64 ("Before land

can be claimed as a homestead, the proof must show that it was used for some one purpose of a home, either by cultivating it for income to be actually used for the purposes of the home, using it directly for the purpose of raising family supplies, or for cutting firewood and the like.").

56. 109 B.R. 715 (Bankr.W.D.Tex.1989).

57. *See In re McCain*, 160 B.R. at 938; *In re Mitchell*, 132 B.R. at 557; *see also Youngblood*, 76 S.W.2d at 761. *Cf. Woodward v. Sanger Bros.*, 246 F. 777, 781 (5th Cir.1917) ("The law as declared in the Constitution and statutes does not undertake to place any limitation on how the land may be used, other than that it is to be the homestead.").

58. *In re Mitchell*, 132 B.R. at 557.

59. *See Miller v. Menke's Widow & Heirs*, 56 Tex. 539, 1882 WL 9430, at *14 (1882). The *Miller* court ruled:

While the use to which the property is applied operates as a designation of the

On the other hand, in cases where the rural homestead consists of separate tracts of land, the mere establishment of a home on one tract may be insufficient to impress homestead character on the detached properties. For years, courts have drawn a distinction between those tracts that are contiguous and non-contiguous with the tract occupied by a residence. With a contiguous tract, one can logically extend the establishment of a home and the activities pertaining to the home to the outer boundaries of that tract. Only an imaginary line separates the residence tract from the contiguous property. Hence, there is a presumption that such a tract is used for the purposes of a home.[60] With a noncontiguous tract, more than an artificial boundary separates it from the home. Unless the noncontiguous tract somehow supports the home, it has no nexus with the residence tract and is nothing more than another piece of property. Thus, a claimant must demonstrate distinct evidence that the noncontiguous, piece of property is associated with the residence tract and that it is more than a separate plot of land.[61]

Yet, even in this more settled area of homestead jurisprudence, the law is not perfectly clear. Most cases refer to the need to show that the separate tracts support the family without adequately addressing the kind of evidence that indicates support. While many of them presume that activities like cultivating crops, pasturing cows, or chopping wood constitute evidence of support,[62] a few others suggest that acts on a detached property that contribute to the comfort, enjoyment, or convenience of the residence or the family may also represent distinct enough evidence of a rural purpose.[63] Under this latter, more liberal view, comforting or convenient acts like taking a walk on the detached property or enjoying the property's aesthetic qualities could possibly impress a homestead. The two cases espousing this broader interpretation, however, concerned a separate tract that was utilized for sharecropping. Those separate tracts provided a form of support beyond mere aesthetic comfort or convenience. Accordingly, the notion that mere comforting or convenient acts may dedicate a homestead on a detached piece of property resonates less powerfully than one might originally believe.

With the preceding analysis in mind, the court concludes that Murray's three tracts are exempt for homestead purposes. First, the 33 acre tract supports the family as the location of the residence that shelters the family. More-

---

homestead in either [urban or rural cases], *yet the use of the rural homestead otherwise than as the home of the family is not necessary to preserve such a homestead to the full extent of the area provided by the constitution;* while in reference to the urban homestead, the use of the home of the family as a residence will not be sufficient to protect and keep alive the exemption of a place for the head of a family to exercise his calling or business, which is detached and separate from the home.
*Id.* (emphasis added). *See also Exall*, 39 S.W. at 960 (quoting *Miller*).

**60.** *See In re Mitchell*, 132 B.R. at 565.

**61.** *See Ruhl v. Kauffman & Runge*, 65 Tex. 723, 1886 WL 4739, at *9 (Tex.1886) ("Whilst the constitution authorizes lots not contiguous to be united in one homestead, it would naturally require more distinct evidences of such destination in proportion to the inconvenience of using as parts of the same home lots remote from each other.").

**62.** *See, e.g., Autry*, 113 S.W. at 748.

**63.** *See Youngblood*, 76 S.W.2d at 761; *Baldeschweiler v. Ship*, 21 Tex.Civ.App. 80, 50 S.W. 644, 645 (1899, no writ) (quoting *Brooks v. Chatham*, 57 Tex. 31, 34, 1882 WL 9451, at *2 (1882)).

over, ample evidence reveals that the Murrays conducted non-economic and economic activities on the property. For example, Atkinson mentioned that she often took walks and picnicked with her grandchildren there. Murray also testified that he gardened and grew hay on the land. There were also references to hunting and cutting wood on this property. Because the supportive acts conducted on the 33 acre tract are presumptively extended to the contiguous tract, the 15 acre tract is also exempt. In addition, the uncontroverted evidence shows that Murray had fished on the 15 acre tract and had planted grass there to reap hay. Under any interpretation, these acts serve to support and sustain the family.

As for the noncontiguous 147 acre tract, the court rejects the Creditors' appeal, despite assuming *arguendo* that Murray must economically benefit from the use of that tract. The record does not leave this court with a definite and firm conviction that the bankruptcy court erred. The weight of the evidence supported Murray's contention that the 147 acre tract was part of the homestead. On several occasions, Murray testified that he farmed and cut wood from that tract. He further stated that he irrigated the land and built a duck blind for that area. Other than some evidence that Murray did not actually farm but sharecropped or leased the property, the record does not contradict this testimony. And whether Murray farmed, leased, or sharecropped the land is arguably rendered irrelevant in light of Murray's assertion that he chopped wood from that tract. Such an act constitutes support for purposes of the rural homestead.

■ Finally, the insinuation that Murray's testimony was deceptive and misleading is irrelevant. First, the court is not convinced that the testimony was such. Second, the bankruptcy court as the trier of fact had the best opportunity to gauge Murray's testimony and demeanor, and it apparently had no problems with the testimony when it concluded in his favor.

## B. Murray May Exempt the Tractor, Riding Lawn Mower, and the 1992 Pickup Truck

Initially, Murray listed a tractor, a riding lawn mower, and a 1992 pickup truck as exempt farming equipment and a 1983 Toyota Land Cruiser and a 1992 Toyota Camry as exempt automobiles. The Creditors objected to these exemptions, arguing that Murray was not a farmer. At the May 6 hearing, the bankruptcy court overruled these objections except for Murray's inclusion of the 1992 pickup truck as exempt farming equipment. Noting that a debtor may exempt only one motor vehicle for each licensed driver in the family, the bankruptcy court directed Murray to delete either the 1992 pickup truck, the 1983 Toyota Land Cruiser, or the 1992 Toyota Camry from the list of claimed exemptions. The Creditors appeal these rulings.

■ Although the Creditors do not deny that a tractor and riding lawn mower may be farming equipment, they first aver that the court should take into account the intensity of a debtor's past farming activities and his sincerity of intention to continue with those activities to determine whether a debtor is legitimately engaged in the trade of fanning and, therefore, able to exempt specific tools as farming implements. The cases that the Creditors cite for support, however, are from outside this circuit and concerned lien avoidance under 11 U.S.C. § 522(f) for implements or tools of the trade.[64] The present case does not raise avoidance issues but solely delves

---

**64.** *Meadows v. Farmers & Merchants Nat'l Bank (In re Meadows),* 75 B.R. 357 (W.D.Va. 1987); *Production Credit Ass'n v. LaFond,* 61 B.R. 303 (D.Minn.1985).

into Texas exemption law. Section 42.002(a)(3) of the Texas Property Code clearly states that fanning or ranching vehicles and implements are exempt. Testimony indicated that the tractor was used for fanning activities such as bailing hay while the riding lawn mower was required to cut the many acres of grass. The Creditors have failed to carry their burden on this issue with any rebuttable evidence.[65] With a dearth of case law on § 42.002(a)(3) and its predecessor to provide any guidance, the court sees no reason to reject a literal interpretation of that section and finds no basis for reversing the bankruptcy court's ruling. Finally, the bankruptcy court did not err when it exempted Murray's 1992 pickup truck. Contrary to the Creditors' assertion, Murray does not exempt the 1992 pickup truck as farming equipment. Instead, Murray has abided by the bankruptcy court's order to list only two motor vehicles as exempt in his Amended Schedule C, and these exemptions fall under §§ 42.001(a) and 42.002(a)(9) of the Texas Property Code.[66] Accordingly, this court finds that the bankruptcy court's order exempting the tractor, the riding lawn mower, and the 1992 pickup truck was not clearly erroneous.

## IV. CONCLUSION

For the reasons stated above, the Bankruptcy Court's rulings on each of the matters challenged by Appellant are hereby AFFIRMED. It is so ORDERED.

---

65. *See In re Cole*, 205 B.R. at 384 (holding that under Bankruptcy Rule 4003(c), objecting party has the burden of proving that exemptions are not proper).

66. Section 42.001(a) protects a certain amount of personal property from garnishment, attachment, execution, or other seizure, exclusive of any liens or other security interests. Section 42.002(a)(9) specifically exempts under § 42.001(a) "a two-wheeled, three-wheeled, or four-wheeled motor vehicle for each member of a family or single adult who holds a driver's license."